E. Jean LANYON, Plaintiff,

v.

UNIVERSITY OF DELAWARE,
Defendant.

Civ. A. No. 80–350.

United States District Court,
D. Delaware.

Aug. 13, 1982.

Maxine LaPlace, Newark, Del., for plaintiff; Dona S. Kahn, Harris & Kahn, Philadelphia, Pa., of counsel.

James F. Burnett, Potter, Anderson & Corroon, Wilmington, Del., for defendant.

OPINION

MURRAY M. SCHWARTZ, District Judge.

This is an employment discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff E. Jean Lanyon is a white woman who was employed by the defendant, the University of Delaware ("University") as an architectural draftsperson from October 6, 1969 through June 30, 1977. The University is an institution of higher learning located in Newark, Delaware. At all times material to this suit it employed more than fifteen employees, and is an employer engaged in an industry affecting commerce within the meaning of sections 701(b), (g), (h) of the Act. 42 U.S.C. § 2000e. Lanyon contends that she was dismissed from her

position at the University and not recalled to work there solely on account of her sex. Trial to the Court occurred from February 16 to 18, 1982, and post-trial argument was held on June 30, 1982. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I. *Facts*

On August 12, 1969, Lanyon completed an application for an "architectural or related drafting" position at the University of Delaware. (PX11).[1] An acquaintance, Karl Gamborg-Nielsen, who was an architect-planner in the University Facilities Planning Office, had told her of a possible opening. (A–13, A–14, A–191). After an initial interview Leonard W. McClain, another architect-planner, interviewed Lanyon. He seemed pleased that she had applied for the position, and told her that the office had a great need for a drafter. (A–15, A–191). Later, at the recommendation of McClain and Gamborg-Nielsen, Robert M. Lamison, the Director of Planning, interviewed the plaintiff. (RML 4; PX12). Lanyon asserted at trial that Lamison had told her that the position would be professional (A–16); Lamison denied that he had discussed benefits with her or told her that she would hold a professional position. (RML 4–6). Plaintiff rejected Lamison's first job offer because the salary was too low (A–16); he then sought more funds for the position. President E. A. Trabant of the University authorized him to offer her $7500 (RML 7; PX13), which was $1300 more than the salary of Richard Cichelli, a man who had held the post until June of 1969. (*See* DX60). Lanyon accepted the offer and began working in the Planning Office on October 6, 1969. (A–17).[2] At the time she was hired, Lanyon had experience in both drafting and the graphic arts. She had approximately

1. Hereinafter the trial transcript will be referred to as "A–, B–, C–, D–, or E–____"; plaintiff's and defendant's exhibits will be referred to as "PX" and "DX," respectively. The deposition of Robert M. Lamison will be indicated as "RML ____."

2. Although Lanyon claimed that she took a pay cut when she accepted the position (A–17), her application for employment indicated that she was earning $600 per month at her previous job, which would have been an annual salary of $7200. (PX11).

fourteen years of experience in architectural drafting, as well as experience in illustrating and graphic arts. (A–12, A–13; see PX3).

The University classified its workers within four categories—faculty, professional staff, salaried staff, and hourly (C–101); professional status was determined under guidelines established by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (DX65).[3] In October, 1969, when Lanyon began at the University, the Director of Planning, Robert Lamison, oversaw the work of the office. He immediately supervised two architect-planners, Karl Gamborg-Nielsen and Leonard McClain (A–18), and one construction-planner, Leonard Cannatelli. (*See* DX2). These four positions were the only positions within that office that were classified as professional by the University. Lanyon, as already noted, was an architectural draftsperson; the other personnel were a part-time accountant and records clerk, Jean Skibinski, two secretaries, and several inspectors who worked in the field. (A–18). All these positions were classified as salaried staff. (*See* C–101).

Plaintiff's duties in the Planning Office consisted principally of providing drafting support for Lamison and the other planners. (A–19, B–4, B–42; PX24). She performed a number of other tasks, including updating the University's topographicals and "as-builts,"[4] keeping track of survey drawings, maintaining architectural files and running errands. In addition, Lamison occasionally assigned her other projects which required graphic arts skills—preparing color boards,[5] designing furniture (A–23, B–18) and updating and designing campus directories. (A–29; *see generally* A–19 to A–21; PX69).

At trial, Lanyon placed particular emphasis on two projects to which she was assigned during her time in the Planning Office. She did some renovating of the Ujaama House, principally the "color work," certain recommendations for energy conservation, purchasing and repairing furniture, and some interior work. (A–21, A–22). Testimony at trial indicated that this was a minor project, however, and one which took her a long time to complete. (C–26—C–27). Plaintiff also had some role in the design and construction of the Mitchell Hall ticket booth, although the extent of that role was disputed. Documents at trial indicated that this was a $3000 project which Lamison assigned to Lanyon to save the $300 fee that would have to be paid to an outside architect. (DX13). Lanyon contended that she did all the work and Gamborg-Nielsen erroneously received the credit. (*See* PX183). It is obvious from the testimony and the evidence, however, that Gamborg-Nielsen had principal responsibility for the project. Lanyon showed her sketches to Gamborg-Nielsen, which he signed to show approval, discussed the locking, mechanical, and electrical systems with him, and attended meetings with him regarding the project. (*See* B–11—B–14). Furthermore, her work was not independent of his supervision; in fact, after a confrontation over delays which had resulted from her failure to complete the drawings on the project (DX13; DX14; DX15), Gamborg-Nielsen instructed her to complete them "in accordance with my specifications and under my direction." (DX16). Lamison further testified that he assigned her to assist Gamborg-Nielsen and that he looked to him as the one in charge of the project. (RML 14).

Despite Lanyon's contentions that the work she did was comparable to that of the planners, there were significant differences between the two positions. The planners did not draw for others. They did not up-date the topographicals or as-builts, nor did they run errands. In addition, they had significantly greater client contact, and

---

3. Among the criteria used to determine professional status were the type of knowledge required for the position, amount of discretion to be exercised by the employee, and the varied nature of the work. (*See* C–102; DX65).

4. "As-builts" are architectural drawings of buildings, which are regularly updated to indicate any structural changes. (A–19).

5. A "color board" is the representation of the colors and the materials used for an interior decorating job. (A–75).

were placed in charge of more jobs and of larger jobs. (*See* B–4, B–5, B–7). As a draftsperson, Lanyon was not held responsible for errors to the same degree as the planners. (RML 60–61). The position Lanyon occupied was primarily a drafting position, with less independence and responsibility than that of the planners. Although he occasionally assigned other projects to Lanyon, Lamison indicated in a memo to her that his inability to use her talents to the fullest in the Planning Office was due to the limitations of the position which she occupied. (PX22; *see* RML 57–58, 60).

Lanyon felt throughout her tenure at the University that her position should be reclassified as professional, and made two formal requests for reclassification.[6] As already noted, she testified that she was told when she was hired that she would be a professional. When she discovered that her position was a staff position, she confronted Lamison, who then described the job as "semiprofessional" and told her that she could upgrade the position after she had been at the University a while. (A–40, A–41; RML 9). In May of 1973, plaintiff formally sought reclassification of her position through the Personnel Office. The procedure for such "job audits" was that a questionnaire would be filled out by the employee describing the duties performed; the information would then be verified by someone from Personnel, and a written determination of the classification prepared.

If the employee or supervisor disagreed with the determination, the Director of Personnel ordinarily would redo the audit. (*See* E–21—E–23, E–26). Lanyon filled out her questionnaire (A–40; PX84) and was visited by Maurice Rouselle of the Personnel Office to verify the information.[7] (A–51, A–52; *see* E–22, E–23). Her request for reclassification was denied because Rouselle felt that the minimum standards required for the position did not meet the criteria of the Fair Labor Standards Act. (DX47). There is some evidence in the record that Lamison told Lanyon after this denial that a college degree would be preferable if she were to be classified as a professional. (A–45). None of the other planners in the department had a degree except for Lamison. (A–46). Lanyon completed the requirements for a liberal arts degree from Goddard College in 1974. (PX6). Lamison's advice was probably erroneous, because testimony at trial indicated that the practice of the Personnel Office was to examine the position, not the person holding the position (E–28, E–30); furthermore, a college degree was not a prerequisite to holding a professional position. (C–66, E–31). Nothing in the record indicates that Lanyon sought a review of Rouselle's determination.

Lanyon's second formal attempt at reclassification occurred in the spring of 1975, under a new reclassification procedure.

**6.** Plaintiff claimed at trial that she made her first request in May 1972, and that it was turned down in December, 1972. (*See* PX66). The Court finds that the evidence does not support this contention. In December of 1972, plaintiff's then-supervisor McClain sent her a memo reprimanding her for tardiness. (DX55). In her response, plaintiff identified herself as "Architectural Draftsman-Graphic Artist." (DX39). McClain took issue with this classification, noting in a reply memo: "I have not been informed by Personnel or my director as to any change in terminology from that of "Draftsman." (DX40). Lamison then wrote a letter to Lanyon addressing the issues raised by McClain and agreeing that her title remained "Draftsman." In that memo, he stated: "At the present time, I do not see the necessity for upgrading the position nor do I have the budget to do so." (PX66; *see* RML 33, 79). Plaintiff's recollection was not clear as to the timing of

this exchange. She did recall that Lamison had told her that there were insufficient funds in the budget (A–55—A–56), and that she had later discovered through other sources in the University that funds for upgrading came from a special personnel fund. (A–44, A–64). Nevertheless, the context of this statement which she recalled was Lanyon's attempt to retitle her position, and not a formal request for reclassification.

**7.** Although plaintiff testified that she thought Rouselle's purpose was a "social visit" and she did not realize that it was part of the audit (A–51, A–52), the questionnaire itself indicated that job descriptions would be verified (*see* PX24), and Lamison indicated that he had assumed that Rouselle's purpose in visiting Lanyon was to audit her position. (RML 80; *see* PX30).

(A–48). Kenneth Thorpe, Director of Personnel, initiated the review within the Personnel Department. (E–27—E–30, E–46). Ronald Frey, an employee of the Personnel Department, sent Lanyon a form to fill out (PX32, DX51) which was to be submitted to Vice President Hocutt, who was responsible for signing it before sending it on for review by the Professional and Administrative Personnel Committee. (A–49; see PX26; PX27). Lamison worked with Lanyon in preparing the form. When Hocutt received the questionnaire, he indicated his disapproval, because he thought that Lamison was describing the person who held the position rather than the position itself. (RML 51). Hocutt forwarded Lamison's draft to Frey with his exceptions to the description, and Lamison's memo in response. (See DX63). Frey changed the description to conform to Hocutt's suggestions, and submitted it to the Committee. (A–50, A–62, A–63; see PX29). Lamison testified that this version was more accurate then the one he had originally prepared with Lanyon.[8] The Committee adopted Frey's recommendation that the position not be upgraded to professional. (See DX65).[9]

In addition to plaintiff's failed efforts to obtain reclassification, a variety of incidents were presented at trial to demonstrate the harassment of Lanyon during her tenure at the University. Plaintiff complained that Gamborg-Nielsen had visited her at her house and offered her his sexual services. Lanyon reported him to Lamison, who cautioned him to be careful in his relationship with her. (A–93—A–94; RML 11–12). She testified that from then on he was very difficult to work with, although she made no direct complaints to Lamison. (A–94, A–95). He would often refer to her as "that damn girl" or "that damn woman." (A–95).[10]

Lanyon had a particularly stormy work relationship with Leonard McClain. (See RML 29–31, 91, 97–98; DX69). Lamison had found that because all the planners sought Lanyon's drafting services, it was necessary to have someone to establish priorities for her work. When the burden of supervision proved too great, Lamison asked McClain to supervise her. (A–77, RML 97, DX48). Lanyon testified that McClain made her working conditions intolerable by his arrogance, belligerence, constant criticism, and frequent reprimands. (See A–77, A–78, A–85—A–90; PX64; PX83; PX84; PX86; PX87; PX88; PX93; PX95). After one particular outburst, Lanyon demanded a meeting with Lamison, after which he removed McClain from his supervisory role and again undertook the position himself. (A–91, A–92; see PX63). Lanyon contends that McClain did not treat the men the way he treated her (A–78), although she admits that McClain was never placed in a position of authority over any of the men.

Plaintiff also complained about certain actions taken by Lamison. She testified that he and others referred to her as "our women's libber" (A–73, A–74), a charge which he denied. (RML 27, 96). She further complained that she was cautioned against doing outside work on University time, although the men sometimes did such work (A–104); Lamison testified that he was unaware that any men did outside work. (RML 85–86). She asserted that Lamison never permitted her to make presentations of projects that she had worked on (see A–115—A–117; PX184), although Lamison stated that she never requested to make such presentations, and that he did

8. Although the caption on the revised questionnaire read "verification of an existing position" (PX29), the committee was aware that the request was for reclassification. (See DX65).

9. Some time after this second attempt, Lanyon met with Kenneth Thorpe and the Affirmative Action Officer, Jeannette Sam. Lanyon asserted at trial that at this meeting Thorpe criticized and threatened her for her attempts at reclassi-

fication. Thorpe disputes the allegation. (See A–67, A–68, A–69, E–46).

10. Testimony at trial indicated that many employees of the Planning Office, possibly including female employees, referred to Lanyon in this way. (C–31; RML 73). Lamison chastised anyone who used these terms in regard to Lanyon. (RML 73).

not have her do them because she never was totally responsible for a project. (RML 23–24). Finally, plaintiff contended that Lamison attempted to have her move to a small windowless office which would have presented a health hazard without checking the office first. (A–118—A–122). The evidence indicates, however, that a female safety inspector ruled that the office was habitable. When Lamison inspected the office at Lanyon's insistence, he did not have Lanyon moved. (See B–21; RML 18–19; PX112; PX116).[11]

Perhaps the most controversial occurrence during Lanyon's employment with the University surrounded the publication of a feminist newspaper, *New Space/New Time* in September of 1976. Lanyon had been asked to draw the cover for the first issue and had also submitted poetry to the publication. (A–109). Her drawing of a bare breasted woman emerging from a cocoon with butterfly wings appeared on the top half of the front page. (PX119). Unknown to Lanyon before publication, on the bottom half of the front page appeared a drawing of a nude woman masturbating which illustrated a first-person account of the activity entitled "Holding My Own." (PX120). The newspaper was distributed on campus and in some cases was left on the desks of University employees. (D–100). Many employees were upset by the newspaper; among them were some members of the Planning Office who assumed that plaintiff had done the second drawing. (B–24, D–101; see PX121).[12] When she arrived at work the next day, Lamison asked her whether she had done the drawing (A–111—A–112), but when she emphatically denied it, he accepted her word. (B–25; RML 26). Lanyon was also called into a meeting with Vice President Gene Cross and other administration representatives and questioned about the newspaper. (A–113—A–114, D–102). The University administration

had been disturbed by the complaints about its distribution and generally felt that the newspaper was inappropriate. (D–101, D–103). Nevertheless, no further action was taken against Lanyon and she was not disciplined in any way; testimony at trial indicates that the incident had nothing to do with her job's elimination in 1977. (RML 26–27).

Lanyon also asserted that she was treated differently from the male planners in that she was required to keep time sheets, although she was unsure whether the planners did (A–126, A–127),[13] and she was not given an assistant when measuring buildings although she was sent to assist the planners when they performed the same chore. (A–122, A–123). Furthermore, she complained that they all demanded that she give their work top priority. (A–74, A–75).

Although much of Lanyon's work was good (A–21, A–96, A–99, C–22—C–23, C–25; PX69), evidence in the record indicates that she was often tardy or absent, she had a negative attitude toward work (A–100—A–101), she was often slow in completing projects, and she was a disruptive influence in the office. (See PX15; PX17; PX18; PX21; PX22). Plaintiff apparently was involved in frequent disputes with other University employees, including the female secretaries in the Planning Office. (B–32, B–33, C–31; RML 57–58, 75, 98; PX22; see B–10).

Although Lanyon contends that there was a general atmosphere of sexism in the office, in 1972 a woman named Ann Jass held a position as a senior planner in the office, a post for which plaintiff did not apply. (RML 69–70). When Jass left in 1973, the University made every effort to abide by its affirmative action policy (DX8), including offering the post to a woman who turned it down before hiring Jerome Posat-

---

**11.** A male planner, Jerome Posatko, occupies that office today. (B–21; see DX35).

**12.** Lanyon testified that two unidentified female employees spit on her when she went to work the day the newspaper was distributed. (B–23).

**13.** Richard Walker, Construction Superintendent of the University of Delaware, testified that he believed that the male planners filled out time sheets as well, so that their work could be apportioned properly to various accounts. (C–31, C–32).

ko in 1974. (*See* RML 68; DX10; DX11; DX20; DX21; DX22).

Lanyon contends that the various incidents recounted above culminated in her discharge in 1977. In March 1976 the President of the University, E. A. Trabant, announced that a ten percent budget cut would be effected across the board by July 1, 1977. (DX25). The University's regulations require a balanced budget. (C–84). Each vice-president was to accomplish a permanent ten percent reduction within his unit of responsibility, although it was not required that each department be cut ten percent. (D–94, D–95). The category into which Lanyon's job fell was one of those targeted for cuts. (C–86, C–87; DX57).

Vice President Cross, who was responsible for the Planning Office, had indicated in early 1977 his intention to eliminate the position of architectural draftsperson and create a new position of "architectural draftsperson/designer." Lanyon testified that Cross had indicated that he wanted a "new man" with a degree for the position. Lanyon asked Cross whether she could be considered for the job, and provided him with a description of what she did in the Planning Office. (A–129, A–130, A–133).

Vice President Worthen, to whom Cross was responsible, asked each of the vice presidents for a plan to accomplish the President's directive. (C–87, D–94, D–95). Lamison had recommended to Cross that Lanyon's post be eliminated because he felt that it would be least injurious to the operation; if necessary, the planners could do their own drafting. (RML 65, PX147). Cross' plan for the Facilities Planning Office was the termination of Lanyon at $12,240, the forced retirement of Gamborg-Nielsen at a salary of $16,900, and a $2000 pay cut as part of Lamison's demotion to University Architect. He would then hire an architectural draftsperson/designer at $15,000, and still be able to show a decrease in the department's budget above the targeted $7,168. (*See* D–98, D–107, D–108; D–111; PX149). This new post was approved but not funded because of an apparent conflict between Cross and Worthen

over funding (D–97, D–98—D–100; PX46), although the proposed cuts were carried out.

Lamison warned Lanyon in January of 1977 of her possible layoff. (A–134). On April 4, 1977, he notified her by letter of her termination as of June 30, 1977, indicating that her position was to be eliminated and that he could not guarantee that she would get another job at the University. (A–134, A–135, B–62, B–63; PX137; PX138). Lanyon testified that she expressed her interest in being recalled to work at the University to Lamison, the Affirmative Action Office, and the Personnel Office. (A–136).

Subsequent to Lanyon's June 30 termination, Gamborg-Nielsen was forcibly retired (D–115, A–137), and when Cross found out that he had been briefly recalled to complete a small project, he ordered Lamison to have him permanently removed. (RML 68, C–65, C–66). McClain left the University in 1977 and Lamison left in 1980. (E–2, E–5, E–6). Robert W. Mayer, Associate Vice President for Facilities Management Services, received responsibility for the Facilities Planning Office after Cross left the University. (E–1, E–2). The office was renamed the Engineering and Construction Department. (E–3). Herman Smith became head of the department. (E–4).

Plaintiff alleges that a man currently occupies the position she left in the Planning Office. Dana Pyle was hired as an architectural designer in 1980. The testimony is unclear as to whether he took the job left by McClain or whether this was the position left unfilled by Cross. (*See* E–5, E–7, E–10—E–12; PX27; PX44; DX33; DX34). Pyle is not a registered architect, but he does drafting only as an incidental part of his job and not for others in the department. (E–57). He works as an architect, surveying the site, designing the facility, selecting material, determining the mechanical and electrical components, and overseeing the work (E–11); a recent project to which he was assigned had an estimated value of $900,000. (E–17). Some of the work that Lanyon performed has

been contracted out (RML 88–89); one estimate is that in the six months after she left it cost twice her salary to have outside contractors do this work. (*See* E–57, E–58).[14]

Plaintiff was never recalled for any position at the University. The recall policy at the University regarding salaried staff was that they would be recalled to the position from which they were released within the twelve months following their release. (D–10). Under this policy staff would not be recalled for professional positions (E–32; E–37), nor would the recall match qualifications of the laid-off worker to an open position. (D–10, D–11). No one was hired for the position left by Lanyon in the twelve months following June 30, 1977. (D–23, D–24). Lanyon testified that as she had understood the policy, she would be recalled for any job for which she was qualified, whether professional or staff. (A–136—A–139, A–156—A–158). She also noted that she had applied for, but not been interviewed for, a graphic artist position.[15] (*See* A–139—A–140, A–165, A–170—A–171; PX139). At trial she conceded that she may have misunderstood the explanation of the Personnel Office regarding the recall policy. (E–20, E–21).

After receiving notice of her impending dismissal, Lanyon contacted the Anti-Discrimination Board of the Delaware Department of Labor (DDOL). (A–137). She spoke to Joseph T. Toomey (C–6), who advised her that she needed hard evidence before she could file a charge. (A–144, A–160, A–185—A–186; *see* PX185). In July, 1977, she again spoke to Toomey, who advised her that she would be unable to make a case unless a man had been hired in her place. He further informed her that she had until January, 1978 to file a charge. (A–160, A–186). On December 19, 1977, plaintiff filed a charge with the DDOL. (A–160; PX171; PX180). The state referred her claim to the EEOC and on January 18, 1978, the EEOC indicated that it would take jurisdiction over the charge on the sixtieth day after it had been filed with the state. (DX174). The EEOC further noted that it would not act on the charge until the state had completed its investigation. The state waived jurisdiction over Lanyon's claim on November 3, 1978. (DX180). On April 22, 1980, the EEOC sent her a notice of a right to sue. (PX170).

II. *Timeliness of Filing With the Equal Employment Opportunity Commission (EEOC)*

The initial legal question presented is whether Lanyon's complaint was filed in time with the EEOC. This issue requires a two-step inquiry. The Court must first determine the date upon which the statute begins to run. Secondly, if the complaint is untimely based on this date, the Court must consider whether the doctrines of estoppel, waiver, or equitable tolling will nevertheless permit plaintiff to present her claim.

The relevant statutory section provides:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief . . . , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful practice occurred . . . .

42 U.S.C. § 2000e–5(e). Delaware has such a state agency, the Delaware Department of Labor (DDOL). The Act further requires that a charge filed in the first instance with the EEOC must be deferred to the state agency until that agency had at least sixty days to act on it. *See* 42 U.S.C.

---

14. Vice President Cross had indicated during the budget cutting process that if cuts were made too deeply in departments, hiring outside contractors could eradicate the savings that had been accomplished. (*See* PX149).

15. A female, Jill Cypher, was hired for this position. (B–37). Cypher has Bachelor of Fine Arts and Master of Fine Arts degrees in advertising design. (B–31; DX20).

§ 2000e–5(d). In *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), the Supreme Court construed Title VII to establish a 240-day period within which a complainant must file with the state agency to preserve the right to federal relief:

> ... a complainant in a deferral State having a fair employment practices agency over one year old need only file his charge within 240 days of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the end of the 300-day period.

*Id.* at 814 n.16, 100 S.Ct. at 2491 n.16.[16] Here, Lanyon filed with the state on December 19, 1977; on January 18, 1978, the EEOC notified Lanyon that it had accepted referral and would assume jurisdiction over the charge on the sixtieth day. The state did not relinquish jurisdiction until November 3, 1978. Thus, because the state failed to complete its consideration within 300 days, the relevant time limit for Lanyon is the 240 days established in *Mohasco.*

Defendant therefore contends that Lanyon is barred from asserting any claims for actions which occurred before April 23, 1977, which is 240 days before that filing date. Defendant further argues that because Lanyon knew that she would lose her job at the University on April 4, 1977, that her claim of discriminatory discharge is untimely. Plaintiff, on the other hand, argues

that she did not know until June 30, 1977 that she had been discriminatorily discharged. She further asserts that even if she did fall outside the limitations period, equitable considerations require this Court to toll the statute and permit her claim to be heard.

As the Supreme Court noted in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980): "Determining the timeliness of [plaintiff]'s EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains." *Id.* at 257, 101 S.Ct. at 504. Plaintiff's principal claims in this lawsuit are discriminatory discharge and discriminatory failure to recall.[17] The failure to recall clearly occurred after April 23, 1977 and that claim is therefore timely. The date of Lanyon's discriminatory discharge is in dispute, however. Defendant argues that it occurred on April 4, 1977, the date upon which Lamison notified Lanyon of her termination as of June 30, 1977. Plaintiff argues that the relevant date is June 30, 1977, the date upon which the University actually terminated her employment.

Lanyon's situation is analogous to the factual setting addressed by the Supreme Court in *Ricks*. In that case, the Supreme Court held that the time limitation for a professor who had been denied tenure began to run when he received notice of the decision—*not* on the date when his employment terminated after his one-year terminal contract expired:

> In sum, the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and com-

---

**16.** Defendant argues that the 300-day limitation applies only if the complaint is timely filed with the state under existing state law. It concedes, nevertheless, that the Third Circuit has held in a case arising under the Age Discrimination in Employment Act, which is construed in conformity with Title VII, that timely filing with the state is not necessary to be covered by the 300-day limitation. *See Davis v. Calgon Corp.*, 627 F.2d 674, 677 (3d Cir. 1980) (per curiam) (construing *Mohasco*), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981).

**17.** Although a significant amount of evidence was introduced at trial regarding Lanyon's working conditions and alleged harassment, these actions are clearly time-barred because they occurred well before the April 23, 1977 cut-off date. This evidence was presented to support plaintiff's contention that her discharge and failure to be recalled were the result of sex discrimination by the University.

municated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later.

*Ricks,* 449 U.S. at 258, 101 S.Ct. at 504 (emphasis in original) (footnote omitted). The Supreme Court recently reaffirmed this holding in *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam). In *Chardon,* non-tenured administrators in the Puerto Rico Department of Education were notified by letter that their appointments would end at some specified date in the future. The Court determined that plaintiffs' § 1981 claims were time-barred by using the date of the letters of notification. The Court noted:

> [R]espondents were notified, when they received their letters, that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suit must be filed.

*Id.* 102 S.Ct. at 29 (citing *Ricks* ).

■ Similarly, Lamison's letter to Lanyon of April 4, 1977, clearly notified her that a final decision had been made to terminate her position. The letter reads:

> This is to confirm my verbal discussion with you regarding the position you now hold. As of June 30, 1977, the position of Architectural Draftsperson will be discontinued. This termination is necessary because of the reductions of staff to meet a limited University operating budget.
>
> Hopefully, a new position may be established to accommodate the continued demands for in-house design services. If such a position is approved, you may, if you wish, apply for it; however, no assurance can be given of your acceptance.
>
> You have advised me you are actively seeking other employment at the University or elsewhere. This is wise on your part since the future workload at the Facilities Planning Office is quite uncertain at the present time.
>
> I extend my best wishes for your success in whatever future endeavor you may find yourself.

(PX137). Plaintiff asserts that language in this letter and oral conversations with various University employees led her to believe that a place would be found for her within the University. The Supreme Court noted in *Ricks,* however, that language in plaintiff's notification letter which indicated a possibility that the decision to terminate his employment could be reversed through the grievance process did not make that decision any less final. *See Delaware State College v. Ricks,* 449 U.S. at 261, 101 S.Ct. at 506.

Plaintiff reasonably should have known on April 4, 1977 that she had been discharged. Furthermore, her own testimony indicates that she had reason to believe that the discharge was discriminatory. *See McWilliams v. Escambia County School Board,* 658 F.2d 326, 328 (5th Cir. 1981); *Hart v. J. T. Baker Chemical Corp.,* 598 F.2d 829, 834 (3d Cir. 1979) (suspicions sufficient at time of discharge to lead reasonable person to inquire into reasons for discharge). Plaintiff catalogued a long list of grievances during trial, amounting to what she considered to be an atmosphere of harassment, discrimination, and retaliatory treatment. In fact, she kept contemporaneous records of these events at the advice of the University's Affirmative Action Office. At the time she received the letter, she had every reason to believe that it was the culmination of years of disparate treatment. The Court must therefore hold that the date of Lanyon's discriminatory discharge for statute of limitations purposes was April 4, 1977.

Unless the Court holds that equitable considerations preclude the statute of limitations from running against her, plaintiff's claim must be held to be untimely. The Supreme Court has recently held that the statute of limitations in Title VII is not jurisdictional, stating: "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines,* —— U.S. ——, ——,

102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). The Third Circuit Court of Appeals has recently indicated in another context that at least three situations appropriately call for equitable tolling: 1) where the defendant has actively misled the plaintiff regarding his cause of action; 2) where the plaintiff has in an extraordinary way been prevented from asserting his rights; and 3) where the plaintiff erroneously filed a timely complaint in the wrong forum.[18] *See School District of City of Allentown v. Marshall*, 657 F.2d 16, 20 (3d Cir. 1981) (time limits in Toxic Substances Control Act). In that case, the appellate court further stated that "[t]he restrictions on equitable tolling, however, must be scrupulously observed," *id.* at 19, noting:

> The tolling exception is not an open-ended invitation to the courts to disregard limitations periods simply because they bar what may be an otherwise meritorious cause. We may not ignore the legislative intent to grant the defendant a period of repose after the limitations period has expired.

*Id.* at 20.

Lanyon urges that she was affirmatively misled by actions taken by the University and statements made to her by a state employee to whom she had initially brought her complaint. Defendant denies that it took any action to mislead plaintiff and asserts that erroneous advice from a state employee is not sufficient grounds for tolling the statute. As the Court has already indicated, the University did not mislead Lanyon into thinking she would still be employed by the University. The issue is whether Lanyon's reliance on statements by the Delaware Department of Labor employee which later proved to be erroneous should preclude the running of the statute.

As already noted, Lanyon stated at trial that the employee to whom she spoke at the State Department of Labor had told her that she needed more proof to file her charge and on a subsequent visit, had told

her that she needed to prove that a man had been hired in her place. He also told her that she had until the beginning of 1978 to file her complaint. Joseph Toomey, the state worker to whom she spoke, testified that he did not recall the conversations but did not refute Lanyon's testimony. (See E–84—E–89).

The Court does not believe that Lanyon should suffer here because of errors made by the agency to which she had initially brought her complaint. *See Roberts v. Arizona Board of Regents*, 661 F.2d 796, 799 (9th Cir. 1981) (EEOC failure to refer charge to state agency should not redound to plaintiff's detriment); *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295, 1303 (5th Cir. 1979) (equitable modification is appropriate when EEOC misleads complainant about the nature of his rights under Title VII). In light of Lanyon's active attempt to seek redress for what she considered to be discriminatory treatment, the Court accepts as credible Lanyon's testimony that her failure to file any sooner than she did was based on representations by the state agency that she needed more solid evidence to prove her case. Furthermore, the period of delay is only nineteen days. The Court holds that the limitations period was tolled by the misrepresentations of the Delaware Department of Labor, and that Lanyon's complaint of discriminatory discharge was timely filed.

### III. *The Merits*

Having determined that plaintiff's complaint was timely filed with the EEOC, the Court must now ascertain whether she has successfully demonstrated that she was the victim of sex discrimination by the University. The Supreme Court has recently articulated the respective burdens of plaintiff and defendant in a Title VII action:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in

---

**18.** The court did note: "We do not now decide whether these three categories are exclusive, but we agree that they are the principal situa-

tions where tolling is appropriate." *School District of Allentown v. Marshall*, 657 F.2d 16, 20 (3d Cir. 1981).

proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). The ultimate burden of proof, of course, is always on the plaintiff. *Id.* at 253, 101 S.Ct. at 1093. This task is simply "to demonstrate that similarly situated employees were not treated equally." *Id.* at 258, 101 S.Ct. at 1096.

In a discriminatory discharge situation, a plaintiff may make a prima facie showing of discrimination by showing that she is a member of a protected class, that she was qualified for the position which she occupied, that despite her qualifications she was terminated, and that after her termination, the position remained open. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). For discriminatory failure to recall, the plaintiff may show that she is a member of a protected class, that she was qualified for and had recall rights in the position from which she was terminated, that despite these qualifications she was not recalled, and that other employees with lesser right to recall were recalled by the employer. *See Burris v. Davidson Transfer & Storage Co.,* 527 F.Supp. 930, 932 (D.Del. 1981).

Lanyon has not successfully made a prima facie case of sex discrimination in her discharge and failure to be recalled. Lanyon is female, she was qualified for the job, and she was terminated. She has not shown, however, that her position remained open and that the University continued to seek applicants of her qualifications. Her notification letter of April 4, 1977, clearly states that her position was to be eliminated. The evidence indicates that it was eliminated on June 30, 1977. Plaintiff contends that Dana Pyle, a male, now occupies her position in the Planning Office, but this is not borne out by the evidence. Pyle does not do any drafting for other planners, nor does he perform the upkeep and maintenance of architectural drawings and maps that Lanyon did. His role in the office appears to be closely related to that of the planners in terms of work load and responsibility.[19] In short, Lanyon has failed to demonstrate that a male occupies the position which she held in the Planning Office.

Furthermore, on her charge of discriminatory failure to recall, Lanyon has not proven that she had any recall rights to any job which the University filled. The University's policy was to recall an employee to the same job they held before termination if it reopened during the twelve months following this termination. Lanyon's job at the Planning Office was not reinstated during that time. The University was under no legal obligation to find her another post or to interview her for any position, such as the graphic artist position, for which she did apply. Plaintiff's apparent misunderstanding of her recall rights is unfortunate, but it does not entitle her to more rights than she was to receive under University policy.[20]

---

**19.** The fact that the University has contracted out some of the tasks that Lanyon had performed does not save plaintiff's case here. Evidence that the University has expended twice Lanyon's salary in this effort might well go to proving that the University's preferred reason for eliminating her job was a pretext for sex discrimination, but it is doubtful that the fact of contracting out alone salvages plaintiff's prima facie case. Whenever any job is eliminated, tasks ordinarily will have to be reassigned in some way; that fact alone does not raise an inference of impermissible bias.

**20.** Plaintiff objected at trial, and the Court excluded as hearsay, testimony of a current Personnel Officer employer, Linda Hsu, regarding what she was told regarding the recall policy as it stood before her employment there in 1978. Nevertheless, the only testimony to contradict the inference that the University's policy had remained the same regarding salaried staff was Lanyon's, and she admitted under questioning by the Court that she may well have misunderstood the recall policy as it affected staff personnel.

■ Even if the Court were to assume that plaintiff had proven a prima facie case of discriminatory discharge by a preponderance of the evidence, the University has articulated a legitimate, nondiscriminatory reason for her discharge—the ten percent budget reduction. Defendant's evidence indicated that Lanyon's position was eliminated as part of an overall economy measure. Once that burden of production was met, it fell to the plaintiff to show that this articulated reason was a pretext.

■ Plaintiff's attempt to prove that this reason was not the real reason for her termination took two paths. First, Lanyon contended that the University did not have to eliminate her job to achieve a ten percent budget reduction. Second, she contended that her discharge was the culmination of many years of discriminatory treatment.

Plaintiff's first contention may be addressed quickly. The Supreme Court has recently noted that Title VII "does not require the employer to restructure his employment practices to maximize the number of minorities and women hired." *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 259, 101 S.Ct. at 1097. The University was not required to adhere rigidly to a ten percent cut in each department; certainly it was free to choose the areas that could most easily be terminated without damaging essential University functioning. In addition, Lanyon was not the only member of the Planning Office affected by the budget cuts. Karl Gamborg-Nielsen, the man who allegedly harassed her, was forcibly retired. Robert Lamison, the head of the Planning Office, accepted a demotion and a $2000 cut in pay. The fact that two men, one of whom ran the department, were adversely affected by the cuts negates any possible inference that Lanyon's position was eliminated for a discriminatory purpose. No one was immune from the cost-slashing measures, and Lanyon was simply treated as everyone else.

Plaintiff's second contention, that the many incidents of discrimination which occurred during her employment indicate the pretextual nature of her dismissal, is equally without merit. Lanyon was hired at a salary which was $1300 higher than that of the male preceding her in the post; she was terminated during a budget cut which also terminated one male planner and reduced the salary of her male supervisor. During her tenure at least one woman served as a planner in the office; when that woman left, the University offered the job to another woman, who turned it down. After leaving the University, plaintiff sought but did not receive a position as a graphic artist; that position was filled by a woman.

Beyond the objective facts of plaintiff's employment, the various incidents presented by plaintiff simply do not lead to the inference that her 1977 termination was the product of sex discrimination. Her allegations regarding failed attempts to obtain reclassification do not make any case that she was somehow mistreated by the University because she is a woman. At worst, Lamison misunderstood that Lanyon's status would be as a staff member when he hired her, and he compounded this misunderstanding during her reclassification attempts by focusing on her personal qualifications rather than on the position for which the upgrade was sought. Nothing in the record indicates that the refusals to reclassify Lanyon's position as professional were based on anything other than the objective criteria used by the University to evaluate its positions. Jean Skibinski of the Planning Office, in fact, successfully won a grievance against Vice President Cross which resulted in an upgrade of her position, a procedure which Lanyon apparently did not institute in her case.[21]

Lanyon stressed at trial that she performed the same work as the planners but was treated differently in her working con-

---

21. Plaintiff sought to demonstrate Cross' attitude toward women, in large part by stressing that he was a bishop in the Mormon Church. (*See, e.g.,* E–100). The nature of the evidence regarding Cross' statements was speculative and hearsay, and it was contradicted by other witnesses. Furthermore, in the absence of credible testimony demonstrating that Cross treated women in a sexist manner and that this affected plaintiff's position, the Court will not infer that one discriminates against women based solely on one's religious affiliation.

ditions. The Court does not agree. The planners simply were not similarly situated to Lanyon. As noted earlier, Lanyon's primary role in the Planning Office was to draft for the other planners. She was an assistant to the planners—not a planner. This division of labor did not occur as a result of sex discrimination—there has been at least one male architectural draftsperson and one female senior planner in the Planning Office. The division of labor was a function of the organization and workload of the Planning Office. Lanyon may well have performed projects similar to projects performed by the planners, just as paralegals at times perform jobs that might be performed by attorneys, but that fact alone did not make her a planner. Because she was not similarly situated, and because she was a staff member rather than a professional, it was reasonable that certain requirements and restrictions not placed on the planners be imposed on her. Furthermore, the fact that she was given smaller projects and less responsibility was due to her role as an assistant within the office, and not due to sex bias.

Finally, the Court is not convinced by a preponderance of the evidence that the atmosphere in the Planning Office was pervasively sexist. Lanyon's encounters with McClain and Gamborg-Nielsen may well have been personality conflicts, but the record indicates that she had conflicts with female coworkers as well. Such conflicts do not rise to the level of sex discrimination. The incident of sexual harassment by Gamborg-Nielsen was apparently an isolated occurrence and not one sanctioned by the University. In the same way, it might be argued that the University overreacted to the publication of *New Space/New Time*, but its concern was based on the nature of the controversial drawing and its distribution to University employees and not on the fact that it was a feminist newspaper. More significantly, Lanyon was not punished in any way for her activity, nor was she further criticized for her role once she reported that she had not done the drawing in question. In short, the many incidents and events presented at trial simply do not impel the Court to the conclusion that Lanyon's termination was because of her sex.

The Court holds that plaintiff has failed to prove by a preponderance of the evidence that she was the victim of sex discrimination at the hands of the University.

An order will issue in conformance with this opinion.