Sara L. FERGUSON, Plaintiff,

v.

E.I. duPONT de NEMOURS AND
COMPANY, INC., Defendant.

Civ. A. No. 76–407, 77–48.

United States District Court,
D. Delaware.

March 24, 1983.

Mary C. Boudart, and Vivian Ann Houghton, Boudart & Houghton, Wilmington, Del., for plaintiff.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Charles E. Mitchell, Wilmington, Del., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

### I. *Introduction*

In November of 1976, plaintiff Sara L. Ferguson[1] commenced a sex discrimination action pursuant to Title VII of the Civil Rights Act of 1964[2] ("Title VII") against defendant E.I. duPont de Nemours and Company, Inc. ("Du Pont").[3] Basically, plaintiff claimed violations of Title VII based upon the following four theories: first, denial of promotion due to intentional sexual discrimination; second, wage discrimination; third, sexual harassment;[4] and fourth, retaliation. The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1337 and 42 U.S.C. §§ 2000e–5(f)(3). These claims were tried to the Court from September 15 through September 21, 1982. Post-trial briefing was completed and oral argument held on December 28, 1982. Consequently, the action is ready for disposition and what follows constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

### II. *Factual Background*

#### A. *The Principal Parties and Players*

In April of 1973, Ferguson applied to Du Pont for a secretarial position. She had recently received a Bachelors of Arts in Spanish Literature with a minor in Sociology from the University of Delaware in 1972. Trial Transcript ("Tr."), A–5.[5] Ferguson was hired as a secretary in the secretarial pool of Du Pont's Public Affairs Department.[6] She began work on April 30, 1973 at a salary of $600 per month. In July of 1973, she moved to the International Section of the Public Affairs Department.[7] Initially, she performed duties for people outside the International Section, but eventually worked solely in the section. Dkt. 148, § 3, ¶ 4.

When Ferguson joined the International Section, it consisted of a manager, Dimitri Andriadis, a Public Relations Representa-

---

**1.** Plaintiff married in 1977 and now is known as Sara Kilpatrick. For simplicity's sake, all references will be made to "plaintiff" or "Ferguson," although in some quotations references may be made to "Sally."

**2.** Codified at 42 U.S.C. §§ 2000e *et seq.*

**3.** Du Pont is, and at all relevant times was, an employer as defined by section 701 of Title VII, 42 U.S.C. § 2000e. Prior to April 25, 1975 plaintiff was an employee as defined by section 701. *Id.; see* PreTrial Order, Docket Item ("Dkt.") 148, § 3, ¶¶ 1–2.

**4.** Plaintiff also alleged sexual harassment based upon sexual advances by her supervisor. Since no evidence of such advances was adduced at trial, this claim was involuntarily dismissed pursuant to Fed.R.Civ.P. 41(b) at the conclusion of plaintiff's case in chief.

**5.** Plaintiff graduated in the middle of her class with a grade point average of 2.68. Between June of 1972 and April of 1973 she traveled in Europe and tutored students in English for five months while living in Spain. Dkt. 148, § 3, ¶ 14.

**6.** The Public Affairs Department advises and assists corporate management and individual departments in a variety of areas including, *inter alia:* Media relations, advertising, community relations and product protection from criticism. Unlike an industrial department, involved in producing and selling, Public Affairs functions as a staff or auxiliary department which serves the other departments and the corporation in general. Within the Du Pont organization, it is a rather small department, employing between 120 and 130 persons. Of these, approximately two-thirds were professional level employees and one-third secretarial, stenographic or clerical employees. Tr. D–9–10; C–62–68.

**7.** The International Section performed four basic functions: first, international issue identification and analysis; second, the development and recommendation of corporate policies regarding international issues; third, media relations; and fourth, assistance to foreign subsidiaries in recruiting and developing public affairs personnel. Tr. C–143–44.

tive,[8] James F. Joines, a secretary to Andriadis, Virginia Hamilton, and another secretary, the plaintiff. Dkt. 148, § 3, ¶ 5. Ferguson worked primarily for Joines but performed some work for Andriadis. *Id.*

In May of 1974, Joines was transferred to another position in the Public Affairs Department and Nuot D. Laetsch was transferred to the International Section. Laetsch, a Swiss resident, had been employed by Du Pont since 1972 as a Public Relations Representative in its Geneva, Switzerland, office. *Id.* at ¶ 7.[9] This assignment was temporary and designed for training and development of members of the Public Affairs Department working outside the corporate headquarters. *Id.* at ¶ 8. Laetsch was the second European chosen for such a temporary orientation position. Tr. D–15–16. He worked in the International Section from May 1, 1974 to February 15, 1975, and in other sections of the Department thereafter before returning to Geneva. *Id.* While in the International Section, Laetsch occupied the office previously occupied by Joines.

On November 1, 1974 Catherine Houghton joined the International Section as a Public Relations Representative. She had worked for Du Pont as a research associate in another section of the Public Affairs Department since September 1974. During November, Houghton's office was located in a building other than the one housing the International Section. When she moved into the same building, her office was not in the same suite as Andriadis, Laetsch, Ferguson, and Hamilton. Dkt. 148, § 3, ¶ 9. Houghton was employed by Du Pont until September of 1975. Tr. B–13; C–171.

On October 1, 1974, Hamilton retired and plaintiff became secretary to Andriadis, Laetsch, and Houghton. She received a promotional salary increase from $679 to $739 per month. Dkt. 148, § 3, ¶ 10; Tr. D–70, D–83. The International Section functioned with only one secretary for a period of time until Toni deAngelis joined the Section. Tr. B–32.

Ferguson complained to the management of the Public Affairs Department about matters which ultimately were raised in this lawsuit.[10] The Du Pont personnel involved in the investigation of Ferguson's complaint, and their positions at that time, were: Thomas W. Stephenson, the Department Director; Harlan P. Wendell, the Department Assistant Director; George H. Soule, the Department Personnel Director; and Robert P. McCuen, a Division Manager within the Department. Tr. C–9; D–12; E–23, 31–32.

### B. *Plaintiff's Promotion Claim*

In the spring of 1974, Ferguson expressed to Andriadis an interest in a promotion to a staff level position in the Public Affairs Department. Plaintiff's Exhibit ("PX")–2, at 4, Tr. A–13–14.[11] Plaintiff testified that in the spring of 1974, Andriadis related that she was being considered for a staff position with the responsibility of liaison with Latin American subsidiaries—a position which did not exist at the time. Tr. A–13; PX–2, at 4. Andriadis testified that he had no recollection of a conversation about such a specific position, Tr. C–177, and, in any case, had no ability to create a new position.

---

**8.** The term "Public Relations Representative" was used interchangeably with the term "Public Affairs Representative" at trial. Both refer to a staff or exempt professional level position within the Public Affairs Department.

**9.** Laetsch graduated from the University of Geneva in 1969 with the equivalent of a master's degree and, prior to working for Du Pont, had worked for Associated Press/Dow Jones as an editorial assistant to the correspondent for Switzerland, for McGraw-Hill as an associate editor of *Modern Plastics*, and spent three months in Pakistan as a Red Cross delegate. He speaks German, French, and English and

has some knowledge of Spanish and Italian. Dkt. 148, ¶ 7.

**10.** For a discussion of the complaint, its nature, and the investigation *see infra* sections II, B; C.

**11.** The parties disagree as to precisely when Ferguson expressed interest in a promotion to a staff position. Andriadis testified that she expressed such an interest in mid to late 1974. Tr. B–64. The Court finds the testimony of Ferguson more credible and that she did so in the spring of 1974.

Tr. B–64–65. However, Andriadis did undertake to put forward her name for consideration should a staff position come open. Tr. B–64. In addition, he urged plaintiff to better her clerical skills, retain and enhance her linguistic abilities and to attend higher education courses. All of these things could assist plaintiff's development with Du Pont and enhance her professional prospects. Tr. B–72.

Andriadis recorded Ferguson's interests in promotion in her October 1974 performance review. PX–31. In addition, on numerous occasions, he orally advised his division manager, Robert P. McCuen, of her interests and abilities. Tr. D–13, D–77.

The Public Affairs Department does not administer written tests in selecting professional (staff or managerial) personnel. Dkt. 148, § 3, ¶ 12. The process, as developed through the testimony of George Soule—the personnel manager of the Public Affairs Department from 1972 through 1975—was relatively informal. Vacancies or newly created positions would be filled in the following manner: first, employees within the Department were considered; second, employees outside the Department, but within Du Pont, as identified by the Employees Relations Department, were considered; and finally, individuals outside Du Pont were considered. Tr. C–8–10, PX–88, Answer 11. Since the Department did not maintain bulletin boards or issue circulars either posting or advising of vacancies, notice of the availability of a position was by word of mouth. Tr. B–73, C–11.

Wyatt DeLoache, the personnel manager of the Public Affairs Department from late 1975 to 1980 testified that when a vacancy occurred, rather than fill it with another person, the position might be eliminated and duties shifted to other personnel. On the other hand, a position might be created, even without an existing vacancy, for an exceptionally qualified applicant. Tr. C–

68–69. In any case, DeLoache delineated the following as desirable qualifications: first, advanced quality education, preferably graduate studies in the humanities, business or law; second, experience in public affairs; and third, personal characteristics such as poise, integrity, judgment, high motivation, and gregariousness. Tr. C–72–74.

Du Pont's Public Affairs Department made a serious effort to promote secretarial level personnel to staff positions and instituted a procedure to accomplish this goal. Each fall, the Department conducted a review of all departmental employees. Tr. D–13; E–23–24. The Director, Assistant Director, Division Managers and the Personnel Manager participated in this review. One aspect of that review involved the identification and listing of secretaries within the Department who, by reason of their background and performance, might be viewed as candidates for promotion to appropriate exempt level positions. This was pursuant to an ongoing effort at that time to increase the number of women at the professional level, primarily from outside hiring but also in a few instances by the promotion of able and experienced secretaries. Tr. D–14; C–75.

A significant number of professional level employees in the Department were women. Tr. C–74.[12] During the early 1970's, the above described system utilized to promote secretaries to the professional level resulted in two such promotions in the Department: Sara Garrison and Mary Huffman. Tr. C–75; C–79. Du Pont terminated this program and no other secretaries were promoted to professional level positions after 1976. Tr. C–78, C–83.

During the annual personnel review of 1974, Ferguson, based on recommendations of Andriadis and McCuen, was identified as a secretary with possible potential for pro-

12. Between April of 1973 and September 1975, of 21 persons hired as Public Affairs Representatives, 4, or 20%, were women. PX–95, at 3. No reliable statistics regarding the Department-wide mix of women and men were provided to the Court. In the period beginning in 1974, the Department's efforts in employing women in professional positions was increased as part of an affirmative action program. Tr. C–75. Of the sixteen professional or staff positions at issue in this case, *see infra* note 30, eight were filled by women. Dkt. 148, § 4, ¶ 4.

motion and, after discussion by participants at the meeting, was added to a list of such secretaries. Tr. D–14; E–24. She was, however, only one of a number of secretaries on that list. Defendant's Exhibit ("DX")–1; DX–25 at 10; Tr. D–14.

In December 1974, when plaintiff learned that Laetsch would be moving to a different section of the Public Affairs Department, she went to McCuen to advise him of her interest in the position then held by Laetsch. Dkt. 148, § 3, ¶ 13. McCuen advised her that she should discuss her interest first with her immediate supervisor, Andriadis. Tr. D–17.

In January 1975, plaintiff, in conversations with Andriadis, began pressing a demand for immediate promotion. Tr. C–155. Essentially, she asserted that she should be given the soon to be vacated position occupied by Laetsch or, alternatively, that a staff level position should be created for her because she felt she was doing a significant amount of professional level work. Tr. A–47; PX–2, p. 4; PX–101, p. 3; Tr. C–156; D–17. As to the Laetsch position, however, Du Pont had decided, both because of increasing budgetary constraints and because of the reduced level of work in the section, that Laetsch would not be replaced. Tr. D–16–17; PX–101. In February 1975, when Laetsch moved to another section, no other staff member was brought into the section. Dkt. 148, § 3, ¶ 13.[13]

On February 3, 1975, plaintiff sent a memorandum[14] to Stephenson, Director of the Public Affairs Department. Id. at ¶ 17. Ferguson claimed in the memo that she had been misled about her opportunities for promotion, that she had performed well as a secretary and had assumed a wide range of staff responsibilities, and that she felt she had not been promoted because of Andriadis' attitude toward her as a woman.[15] Stephenson met with Ferguson and Soule and plaintiff repeated her claims. After conferring with Wendell, Stephenson assigned responsibility for investigating the matter to McCuen. Tr. E–30–31.

McCuen met with plaintiff at least five times and with Andriadis several times during February 1975. He prepared memoranda to reflect the substance of these meetings. Dkt. 148, § 3, ¶ 17.[16] With relation to the claim that plaintiff had been doing staff work and she should, therefore, be promoted, McCuen reviewed the memorandum to Stephenson and its attachments, a memorandum from Houghton,[17] and a memorandum from Ferguson to Andriadis endorsed by Laetsch.[18] Nonetheless, McCuen concluded that the plaintiff was simply performing those functions usually

---

**13.** Andriadis currently, however, has an assistant working within his section. His present assistant is David E. Morrison. Tr. B–76. Morrison was preceded by Paul F. Jankowski. Tr. B–80. While the PreTrial Order lists neither of these positions as contested, at trial plaintiff attempted to assert claims to these positions. Tr. D–185. Plaintiff has not pursued this assertion in the post-trial briefing and the Court deems it waived.

**14.** PX–2.

**15.** The memo also complained of sexually "abusive comments and actions." This claim is discussed *infra* at II. C.

**16.** The following meetings were memorialized:
Feb. 7, 1975—McCuen & Ferguson—PX–101
Feb. 7, 1975—McCuen & Andriadis—PX–102
Feb. 11, 1975—McCuen & Ferguson—PX–103
Feb. 12, 1975—McCuen & Ferguson—PX–104

Feb. 12, 1975—McCuen & Andriadis—PX–105
Feb. 20, 1975—McCuen & Ferguson—DX–2
Feb. 28, 1975—McCuen & Ferguson—DX–5
Feb. 28, 1975—McCuen, Soule & Ferguson—DX–6

**17.** PX–47. In this February 3, 1975 memorandum to Stephenson, Houghton described some of plaintiff's work beyond the secretarial level and attached examples grouped in such categories as: administrative skill, substantive ability, and leadership.

**18.** PX–1. This January 30, 1975 memorandum delineates those duties performed by plaintiff beyond what she perceived as secretarial duties. It bears the following endorsement: "I confirm that Sally Ferguson has performed independently or in assisting me the duties mentioned hereafter, with competence and discernment usually expected from a staff member. [signed] Nuot D. Laetsch, January 22, 1975." *Id.*

expected from a good secretary. Tr. D–30–31.

Plaintiff expressed an objection to McCuen's conclusion at the time and currently takes issue with this conclusion based upon her definition of secretarial work as the "typing of manuscripts, letters, memos, routine filing, taking of dictation, answering the phone, relaying phone messages." Tr. A–8. Plaintiff testified that her nonsecretarial responsibilities included assistance with liaison of subsidiaries abroad, preparation and quarterly update of an International Handbook, handling of visits of various individuals and groups, compilation and dissemination of information of Du Pont international activities, and translation of Spanish press releases and memoranda into English. Tr. A–9.[19]

McCuen discussed with plaintiff his conclusion that her definition of secretarial work was too narrow. *See* Tr. D–27–33, 39; PX–104; DX–2. While admitting at trial that some "grey areas" of overlapping work existed between the junior staff and particularly able secretaries, McCuen concluded that plaintiff's occasional forays into this twilight zone simply reinforced the conclusion that she was a good secretary. Tr. D–28–31. McCuen's conclusions regarding the secretarial function were corroborated by DeLoache and by several former and present secretaries. Tr. C–84–85, D–27–31; E–89; E–98; D–129–30; D–137.[20] DeLoache explained, and the Court agrees, that often the distinguishing feature between staff work and secretarial work revolves around the concept of ultimate responsibility. While a secretary may do significant substantive work, the ultimate responsibility for its accuracy and validity resides with the staff member. While a secretary might perform ministerial and logistical tasks, the staff member would make the discretionary decisions giving rise to the secretary's function. Tr. C–85–86.[21]

As to the possibility of promotion, McCuen advised plaintiff that no one would be replacing Laetsch in the International Section and that, therefore, there was no opening at that time. PX–103. McCuen also advised plaintiff that, as to future openings, she would be considered for any for which she was qualified, but only along with other qualified candidates, including other qualified secretaries in the department. Tr. D–34–35, PX–101; PX–103.[22]

### C. *Plaintiff's Sexual Harassment Claim*

In her February 3, 1975 memorandum to Stephenson, plaintiff also alleged "that the manager's attitude toward me as a woman is directly related to his failure to recognize my capability of performing staff duties.... I am willing to submit in writing some of the abusive comments and actions which have led me to this conclusion." PX–2, at 1. Plaintiff reiterated this allegation at trial and stated that she was dissatisfied with the manner in which Andriadis treated her as a woman and that he made frequent sexist remarks. Tr. A–49.

Specifically, plaintiff identified several instances of what she perceived as abusive conduct by Andriadis: first, he once smacked her buttocks as she was leaving the office; second, he would call her into his office for "heart-to-breast" talks; third, he referred to her as his girlfriend in the company of other persons; fourth, he in-

---

**19.** Plaintiff estimated that she devoted approximately 70–80% of her time to these activities and the remaining 20–30% of her time on what she defined as secretarial duties. Tr. A–75. She also contended that the duties she performed corresponded identically with a job description of a Public Affairs Representative in the International Section. Tr. A–21; *see* PX–43.

**20.** Plaintiff did not attempt to distinguish her work from that performed by other secretaries in the Public Affairs Department. In fact, she acknowledged that she generally was doing only what her predecessors had done. Tr. A–102–03.

**21.** Ferguson admitted that she primarily only drafted work that would bear the staff member's signature. Tr. A–28. As such, she implicitly recognizes the importance of accountability.

**22.** For a discussion of those positions claimed by plaintiff and those persons filling the positions *see infra* note 30.

quired about her sexual proclivities and opined on her promiscuity; fifth, he made several coarse comments to her of a sexual nature; and sixth, he described his working relationship with plaintiff by analogy to the marital estate. Tr. A–53–58.

By and large, Andriadis either denied making the alleged statements or stated that they were taken out of context. He did acknowledge, however, use of the term "girl" or "girlfriend" and admitted that he now realizes these terms carry sexist connotations. Tr. B–10–21; B–27–31; B–46; C–161–62; PX–102. Corroboration of the statements are found in the deposition testimony of Laetsch and Houghton. It is concluded Andriadis made statements which were sexist and abusive and were so perceived by plaintiff.

In response to these allegations, Stephenson commissioned McCuen to investigate. In the course of his investigation, plaintiff related to McCuen that Andriadis "had never made any sexual advances to her and that he usually treated her with consideration." PX–101. In further discussions she acknowledged that she felt much of the conduct was unintentional and probably not perceived by Andriadis as offensive. PX–104; DX–22, p. 41; Tr. E–69.

Even though McCuen felt such conduct was uncharacteristic of Andriadis, he was willing to assume it had occurred for purposes of his investigation. McCuen reached three conclusions in making his recommendation for resolution of Ferguson's complaint. Tr. D–37.

First, McCuen was convinced that even if improper remarks had been made, no such conduct would occur in the future because he had made clear to Andriadis that any conduct of the type alleged was intolerable to Du Pont. Tr. D–37; D–76. Moreover, and on a separate occasion, Wendell had made the same point to Andriadis. DX–25, at 46–48. Plaintiff concedes that after her complaint Andriadis did not engage in any further conduct that plaintiff found offensive. Tr. A–120; DX–22, pp. 61–62.

Second, McCuen concluded that, contrary to Ferguson's belief that Andriadis had not been supportive of her, he had all along been "her most consistent and greatest advocate." Tr. D–76–77; PX–101. McCuen's perception is most vividly illustrated by his testimony that "[Andriadis] reported to me on many, many occasions that she was doing a very good job. He told me so many times that it became annoying that she was—ought to be considered for a staff job." Tr. D–77.

Third, as of February 20 McCuen concluded that it would not be necessary to separate Ferguson and Andriadis because it seemed that the matter could best be resolved simply by a discussion between Andriadis and Ferguson. Tr. D–38, DX–2.[23] One exhibit indicates that such a discussion took place on February 24, 1975. DX–3. Andriadis indicated that he had never intended to offend plaintiff and that he was willing to apologize to her in the presence of McCuen. Plaintiff indicated that she did not intend to emphasize the personal allegations, realized that anything said or done was not done with malice or sexist intent, and that she was really only concerned about a promotion to staff member. *Id.* As set forth in the following section, the perceptions and positions of the individuals involved took a drastic change in course.

---

**23.** Andriadis, however, testified that he was deeply hurt by the personal allegations and did not feel he could continue the working relationship with plaintiff if the allegations were not withdrawn. Tr. B–67. He testified that with a full discussion and exposition of the facts Ferguson would realize that she had misconstrued his actions and statements. McCuen inquired if he would be willing to work with Ferguson if she did not press the allegations. Andriadis replied that he would try to "return to the old informal, friendly atmosphere," despite the chilly atmosphere that existed at the time. Tr. B–68–69. Obviously, this conflicts with McCuen's assessment that the situation could be amicably settled through communication. Given his role as conciliator at that time, this expectation was reasonable. Unfortunately, as explained later, the position of Ferguson solidified and McCuen's hopeful assessment proved inaccurate.

D. *Plaintiff's Retaliation Claim—Transfer and Termination* [24]

As noted, after Stephenson received plaintiff's February 3, 1975 memorandum, McCuen was charged with investigating the allegations in the hope of resolving the difficulties. In so doing, McCuen met with the plaintiff several times in February. Throughout these meetings Ferguson maintained that she wanted a promotion to an exempt position and did not want a lateral transfer. PX–103; PX–104. At a meeting on February 20 with McCuen, plaintiff had asked for a job description for her secretarial position; such a description was provided to her on February 25, 1975 by Soule and Andriadis. DX–2; DX–4.

In the morning of February 28, 1975, plaintiff came to see McCuen, bringing with her the job description she had been provided. DX–5. She made it clear to McCuen that she was dissatisfied with the duties expected of her as a secretary, dissatisfied that she was not being promoted to a professional position and dissatisfied with and disinterested in performing the duties outlined in the job description. Tr. D–39; D–55; D–73. Plaintiff testified at trial that the job description included far more than secretarial duties and that she was dissatisfied doing those duties and being paid and classified as a secretary. Tr. E–113.

Following that meeting, McCuen concluded that it would not be productive to leave plaintiff in that secretarial position. Tr. D–39–40; D–73; DX–5. This conclusion differed from his initial position that the differences could be worked out by communication between Ferguson and Andriadis. His reasons were that the work in that secretarial position had to be done and that Ferguson neither wanted nor was motivated to do that work. Tr. D–39; D–73. McCuen, therefore, recommended to Wendell and Stephenson that plaintiff be reassigned to a different secretarial position. Tr. D–39–40.[25] Both agreed with McCuen's assessment and the decision was made to transfer Ferguson. Tr. E–32. In the afternoon of February 28, Ferguson was informed of this decision in a meeting with McCuen and Soule. DX–6. Ferguson stated that she considered this transfer as a reprisal. *Id.;* Tr. A–67.

At the end of February plaintiff was transferred to the secretarial pool. Her salary level and other employee benefits were unchanged. Tr. A–67; D–40; D–78–79. Plaintiff was advised by McCuen that she would work in the secretarial pool until a secretarial job appropriate to her level could be found. Tr. D–40; D–78–79; DX–6. Ferguson began working in the secretarial pool on March 4. Also on March 4, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Tr. A–123. Soule knew of the filing of the charge on that same date because Ferguson provided him with a copy. DX–7.

Soule had primary responsibility for finding an appropriate position for Ferguson. Tr. D–91. After first searching the Department and rejecting possible shifts within the Department on the ground that no shift could be made that would not be somewhat unfair to another secretary, Soule turned to the Employee Relations Department for assistance. Tr. D–91.

Shirley Reilly, then a Replacement Representative in the Employee Relations Department, and others in that Department began searching throughout the downtown offices for an appropriate position for plaintiff. Tr. D–121. Soule did not request Reilly to search for exempt level positions. Tr. D–123.[26] This was, however, a difficult

---

**24.** In this section, the factual basis for Ferguson's wage discrimination claim is also discussed.

**25.** McCuen and Stephenson testified that they had no retaliatory motive in assigning plaintiff to a different secretarial position. Tr. D–40; E–37.

**26.** Ferguson, however, had made an application for any exempt level position within Du Pont on March 3, 1975. A. Larry Linford, a Recruitment Coordinator for Employee Relations in 1975, responded to Soule that no positions were available for a person with her qualifications. PX–108, Tr. D–148. Ferguson sent a

period in which to find a position; it was a period of economic downturn and retrenchment on the part of the Company. Tr. D–122. Nevertheless, Reilly did locate a position in the Advertising Department which Ferguson could consider. Tr. D–121. Ferguson, however, at a meeting with Reilly said that she was not interested in any secretarial position, and wanted only an exempt level position. Tr. D–124.

Soule had considered the possibility of plaintiff becoming secretary to Leavitt White, a supervisor in the Public Affairs Department, for whom plaintiff had indicated she would work. Tr. A–121–22; C–39. That position did not materialize, however, because White's secretary objected to being moved. Tr. E–50. Thereafter Soule continued to look for a position and in early April a position came open as secretary to Robert M. Roberts, a senior Public Relations Representative, and to another individual in the Plastics Department. Tr. D–92. Soule advised Ferguson of this position and that it did not appear that any other position would materialize in the foreseeable future. Tr. D–92, Dkt. 148, § 3 ¶ 18. Plaintiff initially indicated that she would not be interested in that position, but was given about three weeks to consider the position. Tr. A–123; D–93. Plaintiff was advised by Soule that Stephenson made the decision that, if she did not accept that position, she would not have a position with Du Pont and, in effect, would be terminating her employment. Tr. D–93; E–37.

The position offered to plaintiff was appropriate to her secretarial level and involved no reduction in pay or benefits. DX–25, p. 21–22; Tr. D–92; E–36. Moreover, Soule and Wendell viewed the position as secretary to Roberts not as only a real position that had to be filled, but as a very good opportunity. Id. Roberts was one of the most senior and most highly regarded professional members of the department, having previously been a division manager (a position he voluntarily relinquished be-

cause of a personal preference to work as a Public Relations Representative). Tr. D–45; C–135; E–56. Additionally, he was very supportive of individuals who worked for him and at least one of his prior secretaries had been promoted to an exempt level position. Tr. D–93. Furthermore, the position offered plaintiff exposure to an industrial operating department of Du Pont.

Plaintiff's position was that she was unwilling to accept any job other than as secretary to a manager which, in her view, necessarily meant working for but one person. Tr. A–122. This was somewhat inconsistent with her prior favorable disposition to work for White, who was not a manager and whose secretary worked for several people. Tr. C–121. Furthermore, prior to her transfer, she had been secretary not only to Andriadis, but to Laetsch and Houghton as well. Dkt. 148, § 3, ¶ 10. She acknowledged she had no personal objection to either Roberts or the other individual for whom she would be working; she did not inquire as to whether this job would in any respect limit her future opportunities or the nature of the work expected of her in that position; she understood, however, that she would suffer no reduction in pay or benefits. Tr. A–124. During the period she considered the position, she consulted with an attorney, and, as noted, she filed a charge of discrimination with the EEOC. Tr. A–123. After having about three weeks to consider the matter, Tr. A–123, plaintiff, on April 21, 1975, decided not to accept the position offered, even though she knew it would result in the termination of her employment with the Du Pont Company. Tr. A–124.

Ferguson testified concerning two other instances which might be considered relevant to a claim of retaliation. First, when in November of 1974 the Equal Employment Office of the Atomic Energy Commission ("AEC") came to Du Pont to interview

memorandum to Linford, after learning through Soule of Linford's memorandum, that she wished to be considered for any future exempt level positions and apprised of any

openings. PX–109. The practice of Du Pont was to keep such open-ended applications in a current application file for one year after which they were destroyed. Tr. D–109.

employees, Andriadis told Ferguson "not to speak to those people." Tr. A–48. Andriadis testified that he jokingly told Ferguson that she should not speak to the AEC personnel. Tr. B–28. Andriadis' testimony is corroborated by Houghton and the Court finds no threat or attempt at intimidation. PX–52, at 36. Second, Ferguson maintains that she was chastised by Soule and McCuen for talking with other employees about the grievance and that they threatened her with criminal liability. Tr. A–71. There is no corroboration of this testimony and the Court does not credit Ferguson's testimony.

Plaintiff maintained that she was willing to remain in Andriadis' office if he changed his conduct towards her. Even though Andriadis' conduct did change, McCuen found that a productive working relationship was no longer possible and refused to honor Ferguson's desires. Similarly, after being transferred to the secretarial pool, she was willing to remain in the pool until a secretarial position which met her primary criterion—secretary to a manager—became open.[27]

### E. Plaintiff's EEOC Filing and the Position to Which She Claims Entitlement

Plaintiff mailed a charge of discrimination, dated March 4, 1975, to the EEOC, which was received by the EEOC on March 5, 1975. Dkt. 148, § 3, ¶ 19. On March 24, 1975, the EEOC referred that charge to the Delaware Department of Labor. On May 28, 1975, the EEOC deemed plaintiff's charge filed because the Delaware Department of Labor had not yet taken formal action. On March 30, 1976, the EEOC issued a determination with respect to the charge. On December 1, 1976, plaintiff received a notice of right to sue. Id.

Plaintiff claims that between 1974 and 1980 she was unlawfully denied sixteen professional level positions in the Public Affairs Department.[28] Dkt. 148, § 3, ¶ 15. At no time, however, did plaintiff specifically raise with the EEOC a claim of entitlement to any of these positions, Tr. A–115–16, and nothing indicates that the EEOC ever investigated these positions. Rather, the EEOC investigation focused on four unspecified positions of Public Relations Representatives filled between August 1974 and March 1976. No position at issue here was that of a Public Relations Representative filled in that time frame. Dkt. 148, § 3, ¶ 15.

The first time plaintiff evidenced any specific interest in the sixteen positions at issue was in late 1980, when she sought leave to amend her complaint to add claims with respect to those positions and fourteen other positions. Dkt. 127. Plaintiff claims to have applied for these positions in the following ways: as to those six positions filled while plaintiff was employed by Du Pont, through her previously discussed general expression of interest in promotion; and as to those ten positions filled after she left Du Pont, by means of an application filed with the Du Pont in March 1975 for an exempt position anywhere in Du Pont and by means of this lawsuit.

When in March 1975 plaintiff had submitted an application to the Employee Relations Department for an exempt level position anywhere in Du Pont, there were no openings for which plaintiff was qualified, and she was so advised. PX–108; DX–23, pp. 66 and 73. According to Linford, the practice of Du Pont, apparently followed in this instance, was to retain such applications for one year, after which they were discarded. Tr. D–148.[29]

---

27. Plaintiff alleges that she was assured orally at the time of her transfer that she could remain in the secretarial pool until a job as secretary to a manager opened. Tr. A–69. Soule testified that no such assurance was made. Tr. C–40–41. The Court finds the testimony of Soule more credible.

28. Those sixteen people were only some of the new professional level people added to the Department during the period. Tr. D–43.

29. See supra note 26.

Of the sixteen positions plaintiff now claims, eight were filled by women.[30] The general criteria utilized by the Department to fill staff positions encompassed three ar-

**30.** The following are the sixteen positions plaintiff now claims:

(a) *Travis H. Cook* began work as a public relations representative on June 28, 1974. Dkt. 148, § 3, ¶ 15. The decision to hire Cook was made sometime prior to May 22, 1974. Tr. D–89. Cook received a B.A. in engineering and applied physics (*cum laude*) from Harvard University in 1971, an M.B.A. from Harvard Business School in 1974, and a Master's in City Planning from Harvard Graduate School of Design in 1974. During the summers of 1972 and 1973, Cook had been employed as a Staff Analyst and Research Assistant in the Department of Planning and Evaluation of the Environmental Protection Agency. Dkt. 148, § 3, ¶ 16.

(b) *William A. Digel* began work as a public affairs representative on July 15, 1974. Dkt. 148, § 3, ¶ 16. The decision to hire Digel was made sometime prior to June 26, 1974. Tr. D–88. Digel received a B.A. in English from Lehigh University in 1959 and a Master's Degree in English from Lehigh University in 1963. Between 1960 and 1969, Digel was a graduate assistant and instructor of technical writing and literature at Lehigh, and for part of that period also taught writing at Bell Telephone Laboratories. Between 1969, when he was first employed by Du Pont, and 1974 he was the Editor of a Du Pont product-promotion publication. Dkt. 148, § 3, ¶ 16.

(c) *James C. Smith* began work as a public affairs representative on August 1, 1974. Dkt. 148, § 3, ¶ 15. The decision to hire Smith was made sometime prior to June 24, 1974. Tr. D–88. Smith received a B.A. degree in journalism from Ohio State in 1968. For six years (1968–74) he had worked for Du Pont (not in the Public Affairs Department) as the editor of a monthly plant publication. Dkt. 148, § 3, ¶ 16.

(d) *Eddie L. Edmunds* began work as a public relations assistant on August 19, 1974. Dkt. 148, § 3, ¶ 15. The decision to hire Edmunds was made sometime prior to May 24, 1974. Tr. D–89. Edmunds received a B.A. in business in 1973 from Knoxville College, where he was editor of both the college newspaper and yearbook, and an M.B.A. in 1974 from the University of Wisconsin. Prior to joining Du Pont, Edmunds was a news and feature editor with WATE–TV and a Marketing Research Analyst for the Upjohn Company in Kalamazoo, Michigan. Dkt. 148, § 3, ¶ 16.

(e) *A'Lelia P. Bundles* began work as a staff assistant on September 3, 1974. Dkt. 148, § 3 ¶ 15. The decision to hire Bundles was made sometime prior to June 4, 1974. Tr. D–90. Bundles received a B.A. in Social Relations from Radcliffe College in 1974. Prior to joining Du Pont, she had worked part-time as an assistant to a program writer at WGBH–TV, had completed a summer internship with Newsweek magazine in 1973, had during college

been involved in the programming of a weekly two-hour jazz program on Harvard-Radcliffe Radio, WHRB, and had served during the summer of 1970 with an advertising firm. Dkt. 148, § 3 ¶ 16.

(f) *Sara T. Garrison* began work as a staff assistant on February 1, 1975. Dkt. 148, § 3, ¶ 15. Garrison received a B.A. from the University of Delaware in 1968. For seven years (1963–75) Garrison was a secretary in the Public Affairs Department of Du Pont. Dkt. 148, § 3 ¶ 16. She had worked in the publications area and had acquired special publications skills needed for that assignment. Tr. E–28; PX–25, p. 33.

(g) *Mary Elaine Huffman* began work as a staff assistant on September 1, 1976. Dkt. 148, § 3 ¶ 15. Huffman received a B.A. in English from Goucher College in 1957. For 18 years (1958–76) Huffman was a secretary in several different divisions in the Public Affairs Department of Du Pont. Dkt. 148, § 3 ¶ 16. She had worked extensively in audio-visual communications (closed circuit television), and like Garrison, she too had worked in the publications area and knew a great deal about printing and publications, skills needed for that assignment (which was a successor to Garrison). Tr. D–160.

(h) *Stephen E. Littlejohn* began work as a public affairs representative on July 1, 1977. (Dkt. 148, § 3 ¶ 15. Littlejohn received a B.A. in American history (*magna cum laude*) from Harvard University in 1975, and a bachelor's degree in history from King's College (London) in 1977. Before joining Du Pont, Littlejohn had served as a press and advertising coordinator for "McGinnis For Lieutenant Governor" during the summer of 1976, and as a writer for Delaware News Week during the summer of 1975. Dkt. 148, § 3 ¶ 16.

(i) *John P. Neary* began work as a writer on April 17, 1978. Dkt. 148, § 3 ¶ 15. Neary received a B.A. in English from St. Joseph's College ('55) and thereafter studied journalism at Temple University. From 1958 through 1961, he was employed with the *Reading (Pa.) Eagle* as a reporter and headline writer; he was employed as a rewrite man and reporter for the Camden, New Jersey Courier Post from 1961 through 1963; he served as an assistant editor for *Iron Age* from 1963 to 1964; he was employed by the Wilmington News-Journal Company from 1964 to 1969; he was an editorial writer for the official publication of the Greater Philadelphia Chamber of Commerce from 1969 to 1978. In 1970, Neary helped found the Delaware Valley Business Fortnight, a business publication, and in February of 1973 became its editor, a position he held for approximately five years. Dkt. 148, § 3 ¶ 16.

(j) *Kathleen A. Horning* began work as a staff writer on October 23, 1978. Dkt. 148, § 3 ¶ 16. Horning received a B.A. in English (*cum*

eas: first, education; second, experience; and third, personal characteristics. *See supra* at 1179. Ferguson graduated from the University of Delaware with a B.A. in Spanish Literature and a minor in Sociolo-

*laude*) from the University of Delaware in 1972, and a Master's degree in journalism from Temple University in 1981. She had previously served as the Director of Community Relations for the Mental Health Association in Delaware in 1978, as an assistant editor and staff writer in *The Dialog,* a weekly newspaper for the Catholic Diocese of Wilmington, and as a communications assistant in the Office of Communications for the Catholic Diocese of Wilmington. Dkt. 158, § 3, ¶ 16.

(k) *Cynthia G. Loew* began work as a research assistant on March 1, 1979. Dkt. 148, § 3 ¶ 16. Loew received a B.A. in history *(summa cum laude)* from Duke University in 1977, and had studied history and government at Dartmouth College and Vassar College during 1974. Prior to joining Du Pont she had worked at the Historical Society of Pennsylvania as a restorator of historical manuscripts and researcher in the summer of 1973, as an intern in the Research Department of the Republican National Committee in the summer of 1976, as a research analyst with the Pennsylvania House of Representatives in 1977 and 1978, and, from August of 1977 through March of 1978, she performed research for the "Robert J. Butera for Governor Committee." Dkt. 148, § 3 ¶ 16.

(*l*) *Marily E. Darling* began work as a writer on August 13, 1979. Dkt. 148, § 3 ¶ 15. Darling received a B.A. in English from the University of Delaware in 1956 and studied mass media communications with the New School for Social Research in New York City. Prior to joining Du Pont Darling had worked as a Research Assistant from 1958 to 1961 with International Research Associates in New York City; as a free-lance writer for two years for the Scandinavian Airlines System in Stockholm, Sweden, from 1963 through 1965; as a product representative and media planner for the Ted Bates Agency from 1965 through 1968 in New York City; as executive assistant for the Department of Psychiatry at Einstein College of Medicine from 1968–69; as a free-lance writer from 1969–1971 for various publications; and as a news reporter and associate producer from 1971 to 1979 for Channel 12, WHYY–TV. Dkt. 148, § 3 ¶ 16.

(m) *John Charles Hawkins* began work as public affairs representative on September 4, 1979. Dkt. 148, § 3 ¶ 15. Hawkins received a B.A. in political science from Princeton University in 1970. Prior to joining Du Pont, he had worked as a government information officer for the Allegheny Health Department from 1970 to

gy. She travelled to Europe prior to accepting a position with Du Pont and had not quite two years of "hands-on" experience with the Public Affairs Department as a secretary. *See supra* note 5. In all but

1971; as an industrial sales representative for Pittsburgh Valve and Fitting Co. from 1971 to 1972; as a newspaper reporter for the Harrisburg *Patriot News* from 1972 to 1975; as an assistant information director for the National Wildlife Federation from 1975 to 1976; and as an advertising and public relations representative for McIlhenny-Humphrey, Inc. from 1976 to 1979. Dkt. 148, § 3 ¶ 16.

(n) *Sue Lois Daly* began work as a public affairs representative on March 1, 1980. Dkt. 148, § 3 ¶ 15. Daly received a B.S. in English from Temple University in 1969, where she served on the staff of the University's literary magazine *Stylus,* and a Master's in English from Villanova University in 1975. Prior to joining Du Pont she taught high school English, speech and theatre from 1968 through 1976; was an Instructor of Insurance for the Insurance Company of North America from 1976 to 1977; was an instructional specialist/editor for Research for Better Schools, Inc., from December of 1978 through 1980; during the fall semester of 1979, taught expository prose at Temple University; and was employed by Lynell Marketing, Inc., as a writer and researcher from January 1978 through 1980. Dkt. 148, § 3 ¶ 16.

(o) *William D. Osborne* began work as a public affairs representative on March 24, 1980. Dkt. 148, § 3 ¶ 15. Osborne received a B.S. in political science and speech from the University of Delaware in 1971 and during 1972 through 1974 took courses in radio and television at Temple University. Prior to joining Du Pont, Osborne worked as bureau chief of the News Department of WCOJ Radio in 1974, as project director of the Delaware Easter Seal Society from 1974 to 1976, as the executive director of the Delaware Authority for Specialized Transportation (DAST) from 1976 to 1979, and as senior research associate for Social Services Research Institute in Washington, D.C. from 1979 to 1980. Dkt. 148, § 3 ¶ 16.

(p) *Helen R. (Lana) Kirch* began work as a public affairs representative on April 1, 1980. Dkt. 148, § 3 ¶ 15. Kirch received a B.A. in English from Smith College in 1962. Before joining Du Pont in 1970, Kirch had worked as an editor with the Xerox Corporation from 1964 to 1967, as an editor with the National Academy of Sciences from 1968 to 1969, and as an editor with Multimedia, Inc. from 1969 to 1970. With Du Pont, she worked as Supervisor of Editing Services from 1970 to 1979 and as a Senior Systems Analyst from 1979 to 1980. Dkt. 148, § 3 ¶ 16.

four of the sixteen positions—those filled by Sara T. Garrison, Mary Elaine Huffman, Cynthia G. Loew, and Sue Lois Daly—Ferguson was not qualified for the position and therefore was not or would not have been considered.[31] However, had Ferguson been considered for any of the sixteen positions, she would not have received any of the positions due to the superior qualifications of each of the sixteen hired or promoted individuals.[32]

### F. Plaintiff's Post-Termination Employment

At the time of her termination, plaintiff's salary was $808 per month and plaintiff received pay through May 28, 1975. Dkt. 148, § 3 ¶ 18. Plaintiff was denied unemployment compensation by the State of Delaware based on the determination of the hearing examiner that Ferguson had voluntarily terminated her employment. Tr. A–77.

Following the termination of her employment, Ferguson applied to other companies for various positions in the public relations/public affairs area, but received no offers. Tr. A–76–77. She did, however, receive an offer of employment as a secretary with the United States State Department, which she declined to accept. Beginning in August 1975, plaintiff was employed as a secretary by the Prosher Corporation in California at a salary of $850 per month. Dkt. 148, § 3 ¶ 20. She was discharged by that company in October 1975. Id.

Shortly thereafter she was employed by Arthur Young & Company in Beverly Hills, California, again as a secretary, at a salary of $830 per month. Dkt. 148, § 3 ¶ 21. She voluntarily left that company in January 1976 to travel for six months in South America. Id.

After her return from South America, during which she did not work, plaintiff was employed at the Palace Club in Reno, Nevada and later at the Horseshoe Club in Reno, Nevada as a 21 dealer. She was discharged from both jobs. Tr. A–98; Dkt. 148, § 3 ¶ 21. Ferguson then worked at Cerrito's Neptune's Table in Monterey, California and later at the Double Tree Inn in Monterey, California as a cocktail waitress. She was discharged from both positions and later worked as a cocktail waitress at the Whaling Station Inn in Monterey, California. She voluntarily left this position in November 1981. Tr. A–84–86. From November 1981 until June 1982 plaintiff traveled in Central America and Mexico, and did not work. Tr. A–86.

### III. The Promotion Claim—Disparate Treatment

Plaintiff alleges that Du Pont violated Title VII by failing to promote her due to intentional sex discrimination.[33] Defendant raises several procedural defenses to the allegation and also attacks the substantive merits of the claim.

### A. Defendant's Procedural Defenses

Du Pont raises four procedural defenses to Ferguson's promotional discrimination claim: first, that any claims to any of the sixteen positions alleged to be at issue are barred because none of these specific positions was ever presented to or investigated by the EEOC; second, that any claims to five specific positions are time barred because these positions were filled outside the statutory 300-day period in which to file a claim; third, that any claims to any of the positions are time barred because they were

31. See Tr. E–26 (Cook, Digel, Smith, Edmunds, Bundles); D–163–70 (Littlejohn, Neary, Horning, Darling, Hawkins, Osborne, Kirch). Ferguson may have been qualified for several positions. See Tr. E–26 (Garrison, Huffman); D–163 (Loew); D–169 (Daly).

32. See supra note 31; see also Tr. D–44; D–161–71.

33. Section 703(a)(1) of Title VII considers it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.

42 U.S.C. § 2000e–2(a)(1).

not asserted within 90 days of the right to sue letter; and fourth, that any claim to one specific position is time barred because neither the complaint nor the amended complaint lists the position.

Before embarking on an odyssey in search of the proper resolution of the defendant's procedural defenses, a fundamental problem should be examined. There appears to be some confusion between the utilization of the term "position" by the parties. The defendant links the term to specific persons occupying specific jobs, while the plaintiff focuses on the position of a Public Relations Representative. The Court will utilize the term position with regard to specific instances of discrimination—thus by alleging that she has a claim to a position, Ferguson simply articulates a specific instance of discrimination.

 As to the first procedural defense, Du Pont states that since the EEOC investigation considered only four unspecified positions filled between August, 1974 and March 1976 in regard to Ferguson's complaint,[34] and none of these fall within the time frame encompassed by the sixteen contested positions, plaintiff cannot maintain this action because the EEOC never investigated any of those positions. Plaintiffs in Title VII actions, however, are not confined to the specific elements contained in the charge before the EEOC. The subject matter of the complaint may be broader than the charge if the expansion is either reasonably related to the original charge or may reasonably be expected to grow from the original charge. See Hicks v. ABT Associates, Inc., 572 F.2d 960, 963–64 (3d Cir. 1978); Ostapowicz v. Johnson Bronze Co.,

541 F.2d 394, 398–99 (3d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). The test focuses upon the scope of the EEOC's investigation. Sanchez v. Standard Brands, Inc., 431 F.2d 455, 465–66 (5th Cir.1970); Zalewski v. M.A. R.S. Enterprises, Ltd., 561 F.Supp. 601, 605 (D.Del.1982). The concept of scope falls into three basic categories: subject matter, time, and class characterization. See A. Larson, Employment Discrimination § 49.83c at 9B–193. Subject matter of the complaint is not at issue because both the charge and the complaint concern discrimination in promotion. Similarly, class characteristics do not differ. Defendant focuses, instead, on the time frame of the activities, alleging that the EEOC investigation concerned only the August 1974 to March 1976 time period, a period which does not encompass at least ten of the sixteen specified positions.[35] In Ostapowicz the Court of Appeals for the Third Circuit recognized that the scope of the investigation could include new acts during the pendency of the proceedings. 541 F.2d at 399. The Court did not, contrary to defendant's position, erect a limitation that only subsequent acts occurring during the pendency of the EEOC investigation could be asserted. Such a position would exclude subsequent acts after the EEOC investigation. This position is appropriate when the subsequent acts constitute discriminatory treatment wholly unrelated to the original charge.[36] However, when a continuing violation[37] or several instances of discrimination are alleged, the plaintiff need not traverse the procedural hurdle of filing new EEOC charges for each subsequent act of discrimination if the subsequent acts could reason-

34. Ferguson's charge of discrimination alleged discrimination in promotion with regard to the position of Public Relations Representative of the International Section. PX–94, p. 2.

35. As to the other six positions, defendant simply asserts that since these positions were not investigated by the EEOC, they are beyond the scope of the investigation and therefore not cognizable.

36. In such a circumstance, the statutory scheme which favors administrative investiga-

tion and attempted conciliation is thwarted because the EEOC could not investigate the allegations. Ostapowicz, 541 F.2d at 398. This case, however, obviates this concern because the charge before the EEOC—sexual discrimination in promotion—was investigated and attempts to conciliate made.

37. The law relating to continuing violations is hopelessly confused and the Court does not wish to augment the morass. See infra note 42 and accompanying text.

ably be expected to grow out of the charge before the EEOC or its investigation. *King v. New Hampshire Department of Resources and Economic Development,* 420 F.Supp. 1317, 1320 (D.N.H.1970), aff'd, 562 F.2d 80 (1st Cir.1977); *cf. Love v. Pullman Co.,* 404 U.S. 522, 526, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972) (creation of additional procedural technicalities inappropriate in Title VII actions which are usually initiated by lay person).

■ Secondly, Du Pont argues that plaintiff may not assert claims with respect to five specific positions because they were not timely asserted to the EEOC.[38] Title VII requires that charges must be filed with the EEOC within 180 days of the alleged unemployment practice. 42 U.S.C. § 2000e–5(d). An exception exists, however, when the aggrieved person, here Ferguson, resides in what is commonly referred to as a deferral state. *Id.* A deferral state is one which has a state or local agency with authority to grant or seek relief. An aggrieved person who files first with the EEOC and fails to file with the state or local agency is not penalized; rather, Title VII requires the EEOC to defer to the state or local agency until that agency has had at least sixty days to act on it. 42 U.S.C. § 2000e–5(d); *see Lanyon v. University of Delaware,* 544 F.Supp. 1262 (D.Del.1982). The Supreme Court in *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), construed these provisions to erect effectively a 240-day period within which a complainant must file with the state agency to preserve the right to federal relief. *Id.* at 814 n. 16, 100 S.Ct. at 2491 n. 16. Therefore, Ferguson must have filed a charge of discrimination with the state agency within 240 days of a discriminatory act in order to have filed timely.

■ The parties have engaged in a confusing series of arguments in relation to the running of either the 240-day or 300-day periods. Initially, they disagree as to which date the period starts to run. Defendant asserts that the latter period runs from May 28, 1975—the date the complaint was deemed filed with the EEOC after the running of the requisite 60-day deferral period. This construction presumably would cutoff actions prior to August 5, 1974. Plaintiff contends that the 300-day period runs from March 4 or 5, 1975, the former being the date plaintiff mailed the complaint to the EEOC and the latter, the date it was received by the EEOC. Plaintiff's position directly contravenes *Mohasco* and as such is unacceptable.[39] Nonetheless, a dispute remains concerning whether the 240-day period runs from March 5 or from March 24. The Court need not decide the issue of which of the resulting cutoff dates of August 5, 1974 or July 17, 1974 is the applicable date [40] because in each of the five cases,

---

**38.** The five positions are those of Cook, Digel, Smith, Edmunds and Bundles. *See supra* note 30.

**39.** Plaintiff bases this contention on EEOC regulations concerning the filing of charges. 29 C.F.R. § 1601.5 *et seq.* Plaintiff's position is untenable because the regulation defining filing as upon receipt, 29 C.F.R. § 1601.11(b), is obviated by the statutory prohibition of § 706(b) (§ 2000e–5(b)) of Title VII against filing charges that have not been referred to the state or local authority. *Love v. Pullman Co.,* 404 U.S. at 526 n. 5, 92 S.Ct. at 618 n. 5. As such, the 300-day period runs from May 28, 1975—the date the complaint is deemed filed with the EEOC after the 60-day deferral period has run. The problem with this construction, however, is the running of the 240-day period mandated by *Mohasco.* The period could run in this context either from the date the EEOC received the charge—March 5, 1975—or from the date

the EEOC referred the charge to the state— March 24, 1975.

**40.** Even though the Court does not decide this issue, it is apparent that two competing sets of values are pertinent. If the applicable date is the date of EEOC referral, the EEOC presumably could simply postpone action thereby incrementally depriving complaining persons · of their 240-day period as each day of delay passed. Such a scenario certainly was not intended by the Supreme Court in *Mohasco.* On the other hand, when an aggrieved person fails, either purposely or inadvertently, to file a claim with a state agency but instead depends upon the EEOC to refer this claim, arguably they should bear the risk of EEOC delay. *But see Roberts v. Arizona Bd. of Regents,* 661 F.2d 796 (9th Cir.1981) (charge filed timely with EEOC will be considered timely for purposes of § 706(b) even if EEOC fails to defer).

the decision to hire was made well before either date.[41] Plaintiff could not maintain an independent action as to these five positions because they do not fall within the 300-day period mandated by the statute. Plaintiff, however, alleges that she may assert claims to these positions on the basis of a continuing violation theory.[42] The proper focus in this type of action is whether any of the alleged discriminatory actions took place within the statutory time limits. This criterion clearly is established in this instance. Once it is found that the plaintiff has a timely claim, evidence relating to past practices, even though not separately actionable, constitutes evidence relevant to discriminatory intent and recovery. This construction is virtually dictated by the remedial provisions of section 706(g) which limit the award of back pay to a time period of two years prior to the filing of the charge with the EEOC.[43] 42 U.S.C. § 2000e–5(g); *see Jewett v. International Telephone & Telegraph Co.,* 653 F.2d 89, 92 & n. 5 (3d Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *EEOC v. Hay Associates,* 545 F.Supp. 1064 (E.D. Pa.1982); *cf. Croker v. Boeing Co.,* 662 F.2d 975, 990 (3d Cir.1981) (en banc) (critical question is whether there was a timely assertion of a present violation). Accordingly, defendant's second procedural defense cannot carry the day.

■ Du Pont raises a third procedural defense by alleging that claims to any of the sixteen positions are barred because none were timely asserted. Ferguson complied with the statutory requirement imposed by Title VII that suit must be filed within 90 days of receipt of the EEOC right to sue letter. Defendant argues that while timely filed, the complaint failed to enumerate any of the sixteen positions plaintiff now claims, and as such these claims are barred. Defendant has misconstrued the impact of the 90-day rule. Once suit is timely filed, amendment of the complaint is permitted. The basic allegation of the original complaint is discrimination in promotion. The claims to the sixteen specific positions clearly relate back to the original complaint and are not barred. A prior opinion of this Court permitted plaintiff to amend her complaint pursuant to Fed.R. Civ.P. 15(a). *Ferguson v. E.I. duPont de Nemours and Co.,* Civ.Act. 76–407/77–48 (Consolidated) (D.Del. May 20, 1981). Defendant simply seeks to reargue its opposition to the motion to amend and has offered no compelling or reasonable rationale to deviate from the prior decision.

■ Finally, Du Pont asserts that any claim to the position occupied in 1976 by Mary Elaine Huffman is barred because it was neither part of the original complaint nor the amended complaint.[44] Plaintiff counters with the argument that the Huffman position was enumerated in the pretrial order which the defendant signed. Plaintiff also argues that the record contains no objection to the addition of the Huffman position and therefore defendant should not be permitted to argue this point. Plaintiff need only review the pretrial order to see the futility of her position because the defendant clearly contested the addition of Huffman. Dkt. 148, § 5, Defendant's Statement ¶ 4. Since there has been no motion to amend with regard to the Huffman position, Ferguson may not assert any claim to that position.

---

41. *See supra* note 30.

42. It is unclear whether the continuing violation theory has any application in a non-class action Title VII action. *See United Airlines Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *Evans* the Court stated that time-barred claims are unfortunate historic events which, while constituting relevant evidence regarding current practices, do not constitute actionable Title VII violations. *Id.* at 558, 97 S.Ct. at 1889.

43. A contrary construction reaches the anomalous result that while a plaintiff could not assert claims to time-barred positions, the plaintiff could still be awarded back-pay for a period over one year longer than the limitation period.

44. Plaintiff's initial complaint referred only to four unspecified positions as public relations representatives. Dkt. 1, ¶ XVII. Plaintiff's first amended complaint, Dkt. 127, listed 30 positions as at issue. The proposed pretrial order, Dkt. 148, § 1, dropped 15 of those positions and added one position—that of Huffman.

In summary, based upon defendant's procedural defense, Ferguson has no claim to the Huffman position. Plaintiff may, however, pursue her claim of discrimination in promotion due to impermissible gender-based factors as to all other positions.

B. *The Merits of the Disparate Treatment Promotion Claim*

 The Supreme Court has recently refined the concept of the respective burdens imposed upon plaintiff and defendant in a Title VII action:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). Notwithstanding this three step process, the ultimate burden of proof, to demonstrate that similarly situated employees were treated differently, remains with the plaintiff. *Id.* at 253, 258, 101 S.Ct. at 1093, 1096; *Lanyon,* 544 F.Supp. at 1273. Of course, Ferguson must also carry the burden of proving discriminatory intent or motive. *Scott v. University of Delaware,* 601 F.2d 76, 80 (3d Cir.1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1980).

 In a discrimination in hiring case, plaintiff may make a prima facie case by showing four elements: first, that the plaintiff is a member of a protected class; second, that plaintiff applied for and was qualified for a position which the employer was seeking to fill; third, that plaintiff was rejected; and fourth, that the employer continued to seek applicants that were similarly qualified. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The formula has been applied to promotion cases in the following four step process: first, the plaintiff belongs to a protected group; second, that she was qualified for and applied for a promotion; third, that she was considered for and denied the promotion; and fourth, that other employees with similar qualifications who were not members of the protected group were indeed promoted in the same time frame. *Aikens v. United States Postal Service Board of Governors,* 665 F.2d 1057, 1059 (D.C.Cir.1981); *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981). Once established, the prima facie case raises an inference of discrimination because if the facts remain unexplained, the decision was likely to have been based on impermissible factors. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Thus, the prima facie case gives rise to a presumption of discrimination which the defendant may refute by articulating a legitimate business reason and plaintiff may counter with evidence that the reason was simply a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95.

 Proceeding upon the orderly fashion established by *McDonnell Douglas* and its progeny, the Court first looks to whether Ferguson applied for any of the positions at issue.[45] She expressed a generalized interest in a promotion to Andriadis in the spring of 1974. This interest was focused on becoming a Public Relations Representative in the International Section. Of the positions at issue filled in this 1974 to early 1975 time period, none were in the Interna-

---

45. Clearly, Ferguson, as a woman, is a member of a protected class. The first factor is easily satisfied.

tional Section.[46] Nonetheless, Ferguson was seeking a professional level job as a Public Relations Representative and the Court is unwilling to find that she did not apply for a position. This conclusion constitutes a close factual determination. While Ferguson's initial interest apparently was confined to the International Section, Du Pont treated her expression as a broader one. The fundamental reason for this conclusion focuses upon the promotion process in the Public Affairs Department. Since specific positions were not posted or advertised, specific applications would be impossible. Furthermore, Andriadis virtually pestered McCuen with regard to Ferguson's promotion. As such, Ferguson's generalized expression of interest can be considered an application.

During the twilight era while plaintiff's charges were being investigated internally, she did express interest in any exempt level position. Similarly, her general job application sent to Du Pont in March 1975 sought an exempt level position anywhere in Du Pont. Under the circumstances, Ferguson clearly applied for the positions at issue. Those positions filled after March 1976, however, a year after her only application, cannot be considered as relevant since Du Pont neither kept nor was under an obligation to keep her application after the running of one year.[47] In summary, Ferguson only applied for those positions filled prior to March of 1976.

Focusing upon the third attribute of the applied and qualified prerequisite, however, yields a different result. As the findings of fact indicate in twelve of the positions, the persons hired were either more qualified than Ferguson or that she did not have the necessary qualifications for the specific positions. Furthermore, she was legitimately not considered for the majority of the positions. As to four of the positions—those of Garrison, Huffman, Lowe and Daley—while plaintiff might have been qualified, in each case the person promoted or hired was more qualified. *See infra* note 48. Moreover, all of these positions were filled by women, thereby rebutting any inference of discrimination.

Finally, with respect to the final prong of the *McDonnell Douglas/Bundy* prima facie case test, Ferguson has failed to demonstrate that all the positions either remained open or that members from an unprotected class assumed the position. In fact, eight of the sixteen positions were filled by women.

In summary the Court finds that Ferguson has failed to establish a prima facie case of gender-based discrimination. Even had plaintiff met her initial production burden, Du Pont articulated legitimate business reasons for its failure to promote Ferguson.[48] *Board of Trustees v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. at 577–78, 98 S.Ct. at 2949–50. Furthermore, plaintiff has not demonstrated that these reasons were a pretext to camouflage intentional discrimination.[49]

**46.** The Court has already determined that Ferguson's claim to the Huffman position is barred. *See supra* at 1191.

**47.** Ferguson maintains that her March 18, 1975 memorandum to Soule indicating a continued interest in future staff openings and wishing to be apprised of any such openings constitutes application for the later positions. PX–109. The Court knows of no rule of law which permits an employee, especially a former employee, to require an employer to first, retain an application for an indefinite period, and second, to approach the employee with every position, no matter how much later it arises, to see if it fits the employee's fancy. Such a proposition renders the concept of managerial control of recruitment and hiring meaningless.

**48.** Du Pont articulated reasons for the hiring of each of the individuals that filled the sixteen positions at issue. The reasons primarily focused upon the superior qualifications of the individual—a recognized legitimate reason. *See e.g., Holder v. Old Ben Coal Co.,* 618 F.2d 1198, 1202 (7th Cir.1980); *Peters v. Jefferson Chem. Co.,* 516 F.2d 447, 451–52 (5th Cir.1975); *Pond v. Braniff Airways, Inc.,* 500 F.2d 161, 165 (5th Cir.1974).

**49.** Plaintiff asserts only one fact as evidence of a pretext—that Soule deleted the designation of "swing girl" from plaintiff's performance review before submitting an abstract of the reviews to the EEOC. While it is indicative of an effort to conceal insensitivity from the EEOC, it does not demonstrate pretext.

**1194**

IV. *Disparate Impact*

■ It is now well settled that a plaintiff may establish liability under Title VII under two distinct legal theories: first, disparate treatment which focuses upon the discriminatory motive underlying the treatment of members of protected classes; *see General Building Contractors Associates, Inc. v. Pennsylvania,* — U.S. —, 102 S.Ct. 3141, 73 S.Ct. 835 (1982); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981); and second, disparate impact which focuses upon the outcome regardless of how benign the motive underlying the treatment might have been. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1970); *Wilmore v. City of Wilmington,* 699 F.2d 667 at 669 (3d Cir.1983).

■ The disparate impact theory is applicable whenever " 'practices that are facially neutral in their treatment of different groups but in fact fall more harshly on one group than another and cannot be justified by business necessity.' " *Croker v. Boeing Co.,* 662 F.2d 975, 991 (3d Cir.1981) (en banc) (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977)). Plaintiff must establish a prima facie case of disparate impact by either proof of a facially neutral employment policy or practice which nonetheless imposes a substantially disproportional burden upon a protected class as compared to another class, *see id.* at 991, or by statistical proof of gross under-representation of a protected group without identifying any particular policy as its cause. *Wilmore,* at 670.

■ Despite attempts by the Court to have plaintiff both define and substantiate the disparate impact theory as applied to

these facts, plaintiff has provided scant guidance on this claim. Statistical proof was not offered at trial and therefore cannot be considered.[50] Plaintiff, instead, appears to attack the promotion policy of the Public Affairs Department on the basis that it was subjective and implicitly discriminated against women. Plaintiff argues that the promotion process as it applies to the elevation from secretarial positions to professional positions is subjective because it relies on the views of the employee's immediate supervisor. Acknowledging that this policy is facially neutral, plaintiff alleges that the subjective aspect allows supervisory personnel to discriminate on the basis of sexual bias. As presented, plaintiff's position is fatally flawed. Simply establishing that one prong of a promotion system invokes subjectivity, without more, does not demonstrate disparate impact. *See Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir.1980).

As the Supreme Court recognized in *Connecticut v. Teal,* — U.S. —, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), disparate impact claims are designed to reflect the congressional intent to remove arbitrary barriers to the opportunity to compete with members of nonprotected classes for positions. Opportunity, not guarantee, is the operative word. Members of a protected class do not possess an entitlement to a position; rather, they are entitled to the eradication of barriers which effectively bar their professional opportunities. Ferguson was considered eligible for promotion to a professional-level position. That she was not promoted in a system which resulted in the promotion of two female secretaries and the hiring of other professional women highlights plaintiff's difficulty in articulating a disparate impact theory for there is none applicable on these facts.

---

**50.** Plaintiff forwarded some statistical evidence in the post-trial brief but there has been no foundation established for its introduction. Furthermore, the statistical evidence is, at best, of questionable value because plaintiff made no showing, *inter alia,* of the relevant labor market, the number of positions, whether the prop-

er established base was all professional-level employees, only those in the Department, or only those in the International Section. Plaintiff has failed to provide this Court with any meaningful statistical evidence relating to her claim of disparate impact.

### V. Wage Discrimination

Plaintiff claims that she performed the same duties as a male classified as a Public Relations Representative and therefore asserts a claim of wage discrimination. Ferguson claims that she was:

classified as a stenographer yet she successfully performed the vaious [sic] duties and had the resonsibilities [sic] requiring the same skill and effort of persons in Public Affairs staff positions.... Ferguson was actually performing Laetsch's duties while she had neither the position title not rhe [sic] position pay.

Dkt. 165, at 29 (Plaintiff's Opening Post-Trial Brief).[51]

A claim of wage discrimination can be stated under Title VII. *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). When, as here, a wage discrimination claim rests on an assertion of unequal pay for equal work, the standards governing Equal Pay Act claims apply and a plaintiff bears the initial burden of showing that:

(1) The work of the employees of one sex required the exercise of substantially equal skill, effort, and responsibility and was performed under working conditions similar to that of employees of the opposite sex; and (2) the pay to men and women was unequal.

*Piva v. Xerox Corp.,* 654 F.2d 591, 598 (9th Cir.1981).[52]

Plaintiff has not presented any evidence demonstrating that she performed work equal to that of a male. Despite her protestation to the contrary, the evidence demonstrates that Ferguson performed only that work expected of all good secretaries, and that such work did not in any way require "equal skill, effort, and responsibility" as the work of professional level employees. The record further establishes that there were significant differences between the work plaintiff did and the work of the male (Laetsch) with whom she compared herself.[53]

Insofar as plaintiff may claim that she otherwise was discriminated against in her salary, she has offered no evidence to support such a claim. The mere assertion that she was doing work not expected of a secretary, even if true, does not give rise to an inference of discrimination. *Walter v. KFGO Radio,* 518 F.Supp. at 1317 (showing of salary differences between male and female holding same title insufficient to establish *prima facie* case when record does not reflect that jobs were substantially equal in skill, effort, or responsibility).

In all events, the record establishes numerous legitimate reasons for any pay differential between plaintiff and Laetsch. First, during the relevant period, Du Pont management responsible for salary level was not even aware that plaintiff claimed to be doing work like that of Laetsch and, indeed, plaintiff admits that she never asked for any adjustment of her pay based on such work. Second, Laetsch was in Wilmington on a special training assignment where it was recognized that he would not be fully productive and where part of his training assignment was to learn by doing many things of a routine nature. Third, Laetsch had significant experience as a public affairs professional and his salary reflected this experience. Fourth, the record reflects that, in fact, plaintiff and

---

**51.** Plaintiff has failed to flesh out the parameters of her wage discrimination claim and has offered no support for her theories. The Court considers this failure to argue forcefully this claim as indicative of its merit.

**52.** When a Title VII wage discrimination claim is not based on the allegation of equal work and unequal pay "classic Title VII analysis must be applied ...," *Boyd v. Madison County Mut. Ins. Co.,* 653 F.2d 1173, 1177 (7th Cir. 1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1981), and thus, plaintiff

must present some evidence from which the Court could infer that her pay was affected adversely because of her sex. *Walter v. KFGO Radio,* 518 F.Supp. 1309, 1317 (D.N.D.1981).

**53.** The Court does not regard the evidence of the views of Laetsch and Houghton as to Ferguson's work product and ability as either probative or persuasive. Their assessments of Ferguson's abilities are entitled to much less weight than those of Andriadis, her immediate supervisor, or McCuen.

Laetsch did work that was dissimilar with regard to accountability and that, while it may have overlapped in areas, such overlap was consistent with the respective responsibilities of secretaries and professional level people. Finally, when plaintiff presented her claim, a good faith assessment was made by McCuen that plaintiff was not doing anything not expected of a secretary.[54] In sum, the record establishes numerous legitimate non-discriminatory reasons for the salary differential between plaintiff and Laetsch. There is no evidence that any of the reasons are pretextual.

In conclusion, despite Ferguson's contention that she performed the work of a staff person and should have received a commensurate salary, the Court finds that she simply was not performing work of the same nature. The fundamental difference lies in the realm of accountability. Her work was not "substantially identical" and she may not recover.

## VI. Sexual Harassment

Ferguson alleges that she was subjected to sexual harassment based upon a hostile, intimidating, or offensive working environment. Plaintiff bases this claim on a series of comments and one alleged incident of offensive touching. See supra at 1181–1182.

It is now well established that a cause of action for sexual harassment is cognizable under section 703 of Title VII.[55] The parameters of the cause of action, however, remain in a state of flux and no consensus exists concerning when and under what circumstances the employer will be held responsible for acts of supervisory personnel, coworkers or non-employees.

The initial cases recognizing this cause of action considered claims that plaintiffs had been deprived of a tangible job benefit for their failure to succumb to sexual advances. See Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044, 1048–49 (3d Cir. 1977); see also MacKinnon, Sexual Harassment of Working Women (1979); Note, Sexual Harassment and Title VII: The Foundation for the Elimination of Sexual Cooperation as an Employment Condition, 76 Mich.L.Rev. 1007 (1978). Not every unwelcome sexual advance, however, constitutes a violation of Title VII. For example, a mere flirtation has been held insufficient because such an isolated incident fails to establish the requisite showing that "submission to the sexual suggestion constituted a term or condition of employment." Heelan v. Johns-Manville Corp., 451 F.Supp. 1382, 1388 (D.Colo.1974); see also, Clark v. World Airways, 24 Fair Empl.Prac. (BNA) Cases 305, 307 (D.D.C.1980) (Title VII does not reach sexual relationships which have no substantial effect on the employment). Furthermore, sexually aggressive conduct and explicit conversation on the part of the plaintiff may bar a cause of action for sexual harassment. See Gan v. Kepro Circuit System, 27 Empl.Prac.Dec. (CCH) ¶ 32,279, at 23,648 (E.D.Mo.1982).[56] More recently, courts have held that Title VII contemplates a cause of action when the harassment creates a hostile and discriminatory working environment even though there has been no loss of a tangible job benefit. See Henson v. City of Dundee, 682

---

**54.** Plaintiff admits that when she asserted her claim of having done staff work, she did so in order to obtain a promotion, and at no time asked that her pay be adjusted to reflect her performance of staff work.

**55.** Initially, several district courts, faced with claims based on sexual harassment, refused to hold that Title VII allowed for such a cause of action. In each case, the Court of Appeals reversed this holding. See Barnes v. Train, 13 Fair Empl.Prac. Cases (BNA) 123 (D.D.C.1974), rev'd, 561 F.2d 983 (D.C.Cir.1977); Corne v. Bausch & Lomb, Inc., 390 F.Supp. 161 (D.Ariz. 1975), rev'd and remanded on other grounds,

562 F.2d 55 (9th Cir.1977); Tompkins v. Public Serv. Elec. & Gas Co., 422 F.Supp. 553 (D.N.J. 1976), rev'd, 568 F.2d 1044 (3d Cir.1977); Garber v. Saxon Business Products, Inc., 552 F.2d 1032 (4th Cir.1977) (reversing lower court's dismissal for failure to state a claim).

**56.** While there was testimony regarding plaintiff's use of coarse language and wearing attire which some might consider suggestive and inappropriate for a professional woman, plaintiff's conduct cannot be said to constitute a bar to her sexual harassment claim.

F.2d 897, 902 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d at 943–44; *Brown v. City of Guthrie,* 22 Fair Empl.Prac. Cases (BNA) 1627, 1631 (W.D.Okla.1980); *see generally,* Case Comment, *Expanding Title VII to Prohibit a Sexually Harassing Work Environment,* 70 Geo.L.J. 345 (1981).

In an effort to bring consistency to the confusion generated by inconsistent judicial decision, the EEOC published interim guidelines regarding sexual harassment in April of 1980 and final guidelines on September 23, 1980.[57] The guidelines state:

Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when 1. submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment, 2. submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or 3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a).

As noted previously, and as recognized by the EEOC guidelines, cases based upon sexual harassment generally fall within two broad categories: first, sexual coercion or quid pro quo cases, where the employee suffers a tangible job detriment in retaliation for refusing sexual advances of supervisors; and second, offensive or hostile environment cases where no tangible employment loss is involved. Plaintiff's theory on her sexual harassment claim is somewhat unfocused. Ferguson appears to state a hostile environment cause of action yet clutters the environmental landscape with allegations of retaliation. *See* Dkt. 165, at 38–44. (Plaintiff's Opening Post-trial Brief). Since no evidence was adduced at trial concerning sexual advances, the Court granted defendant's motion for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) as to these allegations.[58] As such, plaintiff is left with her claim based upon a hostile work environment.[59]

As set forth in section II, C, *supra,* several incidents involving sexual comments, sexually derogative remarks, and one instance of offensive touching allegedly were made involving Andriadis and Ferguson. While the parties differ as to the context and meaning of the remarks and actions, the Court finds that conduct occurred which plaintiff could reasonably find insulting. Two fundamental questions, however, remain: first, whether these acts constitute an actionable Title VII violation under the hostile environment theory; and second, whether Du Pont is liable for the acts of Andriadis as Ferguson's supervisor.

The Court harbors serious doubt as to whether the incidents complained of constituted a hostile environment within the meaning of existing case law. As noted, not every sexual innuendo or flirtation

**57.** 45 Fed.Reg. 74,677 (1980), *codified at* 29 C.F.R. § 1604.11.

**58.** Due to the disposition of plaintiff's sexual advances claim, the Court need not parse the conundrum of the burden of proof and plaintiff's prima facie Title VII case when sexual advances are involved. Two recent circuit court decisions have addressed this issue in conflicting opinions. *Compare Bundy v. Jackson,* 641 F.2d at 953 (in case involving job benefits and hostile environment, after plaintiff makes out prima facie case, burden of persuasion shifts to defendant to show by clear and convincing evidence, that he had legitimate nondiscriminatory reasons for the action), *with Henson v. City of Dundee,* 682 F.2d at 911 n. 22 (agrees with process in tangible benefit loss action but when mixed claims of loss and hostile environment involved, there should be no shifting of burden of persuasion).

**59.** Plaintiff appears to argue that the allegedly repeated sexual harassment resulted in her ultimately being "forced to terminate her employment with Du Pont." Dkt. 165 at 39. Such a statement fails to recognize the causal relationship required in a sexual advance case where refusal results in the loss of a tangible job benefit. Plaintiff may have stated a claim of constructive discharge based upon the hostile environment: an issue addressed in the ensuing section. *See infra* note 72.

gives rise to an actionable wrong. *See Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" not actionable), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). In order to state a claim, the sexual harassment must be

> sufficiently pervasive so as to alter the condition of employment and create an abusive working environment. Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances.

*Henson v. City of Dundee,* 682 F.2d at 904 (*citing* 29 C.F.R. § 1604.11(b); *see Calcote v. Texas Educational Foundation, Inc.,* 458 F.Supp. 231, 237 (N.D.Tex.1976), *aff'd,* 578 F.2d 95 (5th Cir.1978); *Compston v. Borden, Inc.,* 424 F.Supp. 157, 158–61 (S.D.Ohio 1976)). In *Henson* the plaintiff was subjected to virtual daily harangues, vulgarities, and requests for sexual liasons over the course of two years. *Id.* at 899. While the Court has difficulty considering the relatively few enumerated incidents of An-

driadis' conduct as pervasive or on par with that in *Henson,* it assumes without deciding that Ferguson has established this element of her claim.

■ The Court now turns to the second question: whether Du Pont is liable for the acts of its supervisory personnel. The EEOC guidelines provide that an employer is strictly liable for sexual harassment by supervisory personnel. Based upon the common law theory of vicarious liability, the guidelines deem an employer responsible for sexual harassment by supervisory employees *regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of this occurrence.[60]* The EEOC guidelines, while entitled to deference, do not have the force and effect of law [61] and, for the reasons that follow, the Court declines to apply the guidelines in a hostile environment case involving supervisory personnel.

■ Courts have required notice to the employer before liability can be imposed for the acts of supervisory personnel.[62] The

---

**60.** The guidelines state:

applying general Title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence.

29 C.F.R. § 1604.11(c). The supplemental information published with the guidelines recognizes that many commentators viewed this section as too broad, but the EEOC justified its strict liability coverage by the general standard of employer liability with respect to agents and supervisory employees. 45 *Fed.Reg.* 74,677 (1980).

**61.** *Compare Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 451–52, 95 S.Ct. 2362, 2378, 2387–88, 45 L.Ed.2d 280 (1975) (agency guidelines do not have force and effect of law) *with Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1978) (guidelines "entitled to great deference"). The Supreme Court has rejected EEOC guidelines covering other areas. *See, e.g., Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52

L.Ed.2d 396 (1977) (bona fide seniority systems); *General Elec. Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (pregnancy disability benefits); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (employment selection procedures).

**62.** *See, e.g., Vinson v. Taylor,* 23 Fair Empl. Prac. Cases (BNA) 37 (D.D.C.1980); *Lundington v. Sambo's Restaurant, Inc.,* 474 F.Supp. 480 (E.D.Wis.1979); *Price v. Lawhorn Furniture Co.,* 16 Empl.Prac.Dec. (CCH) ¶ 8,342 (N.D.Ala.1978); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977). While these decisions preceded publication of the EEOC guidelines, at least one district court has rejected the theory of strict liability in a sexual harassment case. *Meyers v. I.T.T.,* 27 Fair Empl.Prac. Cases (BNA) 995 (E.D.Mo.1981). *But see, Miller v. Bank of America,* 600 F.2d 211 (9th Cir.1979) (pre-EEOC guidelines decision which imposed respondeat superior when supervisor had authority to hire, fire, discipline, or to promote). In the instant case, Andriadis had no authority to hire, fire, discipline or promote. Whether liability for conduct of supervisors will vary directly with the extent of managerial power vested in a supervisor by his em-

Court of Appeals for the Third Circuit has imposed an actual or constructive knowledge requirement in the context of a sexual advances case. The Court stated:

> Title VII is violated when a supervisor, with actual or constructive knowledge of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee's job status —evaluation, continued employment, promotion, or other aspects of career development—on a favorable response to those advances or demands, and the employer does not take prompt and appropriate remedial action after acquiring such knowledge.

*Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d at 1048. The Court discerns no reason to deviate from this standard in a hostile environment case on the facts presented. *See Henson v. City of Dundee,* 682 F.2d at 910 (strict liability imposed in case alleging sexual advances; know or should have known standard in hostile environment case).[63] Despite the EEOC guidelines, I believe the better rule is that of requiring actual or constructive knowledge before liability can be imposed in a hostile environment case on the basis of the facts sub judice. The EEOC guidelines impose too onerous of a burden and employers should not be liable if they seek to alleviate or dispel hostile environments by methods such as strict and prompt remedial measures and strictly enforced and well-known company policies. Further, when supervisory personnel engage in such activity, they act outside the scope of their authority and agency principles, therefore, do not apply. *Id.*

■ In this case, Andriadis' superiors promptly investigated Ferguson's allegations. Furthermore, even though such actions were out of character for Andriadis, McCuen assumed the truth of the allegations, took prompt remedial measures, and the incidents indisputably stopped. Under such circumstances, Du Pont will not be held liable for the environment created by Andriadis. *See Bundy v. Jackson,* 641 F.2d at 943; *Barnes v. Costle,* 561 F.2d at 993.[64]

## VII. *Retaliation*

Plaintiff essentially urges that she engaged in protected activities under Title VII when she submitted her February 3 memorandum to Stephenson and later filed a charge of discrimination with the EEOC. Plaintiff theorizes that Du Pont's response constituted two forms of retaliation: first, by reassigning her to the secretarial pool; and second, by constructively discharging her.

---

ployer must await development of case law. I note, however, that under certain circumstances, the supervisory personnel may possess such virtually absolute power and authority within their sphere of influence that they in fact personify the company. In such a context, strict liability may be appropriate.

**63.** The Eleventh Circuit opined:

> We hold that an employer is strictly liable for the actions of its supervisors that amount to sexual discrimination or sexual harassment resulting in tangible job detriment to the subordinate employee.
>
> * * * * * *
>
> In the classic *quid pro quo* case an employer is strictly liable for the conduct of its supervisors, while in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual harassment before the employer may be held liable.
>
> *Henson v. City of Dundee,* 682 F.2d at 910. Judge Clark dissented vigorously from the erec-

tion of such a dual standard and stated that the employer should be strictly liable for the actions of supervisory personnel if they use their positions to create a hostile, sexually harassing work environment. *Id.* at 913–14.

**64.** The Court in *Henson* established the elements of a case involving only a claim of hostile environment as follows: first, the employee belongs to a protected group; second, the employee was subjected to unwelcome sexual harassment; third, the harassment was based on sex; fourth, the harassment affected a term, condition or privilege of employment; and fifth, where the employee seeks to hold the employer responsible for the actions of an employee, the employer must have actual or constructive knowledge and failed to take prompt remedial action. 682 F.2d at 903–05. Conceding the first four elements, Ferguson cannot prevail because there has been no showing of knowledge and prompt remedial measures were taken.

■ Section 704(a) of Title VII creates a separate actionable violation when an employee suffers retaliation for engaging in protected activities.[65] The *McDonnell Douglas* formula has been modified and applied to retaliation claims in the following manner:

> The order and allocation of proof for Title VII suits set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), is applicable to actions for unlawful retaliation under this section. The plaintiff must first establish a prima facie case of retaliation by showing that she engaged in a protected activity, that she was thereafter subjected by her employer to adverse employment action, and that a causal link exists between the two. To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity. Once the plaintiff has established a prima facie case, the burden of production devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the adverse actions. The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff. If the defendant meets this burden, the plaintiff must then show that the asserted reason was a pretext for retaliation. The ultimate burden of persuading the court that the defendant unlawfully retaliated against her remains at all times with the plaintiff.

*Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982) (citations omitted); *accord, Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 454 (10th Cir.1981); *Whatley v. Metropolitan Atlanta Rapid Transit,* 632 F.2d 1325, 1327–28 (5th Cir.1980); *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir. 1980); *Guilday v. Department of Justice,* 485 F.Supp. 324, 325–26 (D.Del.1980). It is essential that the plaintiff show a retaliatory intent or motive on the part of the employer. *Cohen v. Fred Meyer Inc.,* 686 F.2d at 798; *Brunetti v. Wal-Mart Stores Inc.,* 525 F.Supp. 1363 (E.D.Ark.1981); *Rogers v. McCall,* 488 F.Supp. 689, 697–98 (D.D.C.1980); *Crawford v. Roadway Express, Inc.,* 485 F.Supp. 914, 921 (W.D.La.1980).

■ As noted, Ferguson propounds two instances of retaliation: first, her transfer to the secretarial pool; and second, her termination. With regard to the former, an initial question arises as to whether section 704(a) is applicable. At the time of the transfer, February 28, Ferguson had not yet filed her charge with the EEOC. She had, however, sent her memorandum encompassing her complaints to Stephenson on February 3 and had engaged in discussions with McCuen and Soule. While Section 704(a) protects employees who file charges with the EEOC or institute litigation, its ambit is not strictly confined. The statute reads in the disjunctive, protecting such specific activities *or* general activities covered by the phrase "because he has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). While the parameters of the opposition clause are uncertain, its reach clearly transcends participation in Title VII procedures. *See Sias v. City Demonstration Agency,* 588 F.2d 692, 694–95 (10th Cir. 1978); *Novotny v. Great American Federal Savings and Loan Association,* 584 F.2d 1235, 1260 (3d Cir.), *rev'd on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1978); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 231 (1st Cir.1976). I hold that Ferguson's complaint to management regarding the promo-

---

**65.** Section 704(a) provides, in part:

It shall be an unlawful employment practice for an *employer to discriminate against any* of his employees or applicants for employment . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, asserted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

tion system and her subjection to sexual harassment is a lawfully protected activity.

■ Ferguson has satisfied one of the other prongs of her prima facie case. Her transfer to the secretarial pool was clearly and admittedly caused by her articulated complaints.[66] Even with causality established, Ferguson has not satisfied the final prong because she has not established that she was subjected to an adverse employment action. Her transfer was only temporary and she retained her pay and benefits. Had she been permanently reassigned or received a reduction in pay, this element would be established. *See Trout v. Hidalgo,* 517 F.Supp. 873, 891 (D.D.C.1981) (individuals subjected to permanent transfers and deprived of duties and responsibilities have suffered retaliation). Accordingly, the Court holds that Ferguson has failed to establish her prima facie case.

■ Even assuming satisfaction of the elements of her prima facie case, Ferguson may not prevail because Du Pont has established a legitimate nondiscriminatory motive and Ferguson has failed to demonstrate any pretext. The Court adopts and accepts McCuen's rationale for the transfer. Specifically, McCuen's decision was based primarily upon Ferguson's evident dissatisfaction with her position as a secretary and the policies of the International Section regarding promotion.[67] While down played by Du Pont, a secondary reason for plaintiff's transfer to the secretarial pool was that the atmosphere between Ferguson and Andriadis had deteriorated and the two could therefore not comprise an effective and productive team.

While it seems incongruous that the person engaged in the protected activity and subjected to harassment by her supervisor is forced to move, pretext has not been demonstrated on the presented facts. Regardless of who was right and who was wrong, the employer must have the discretion, within certain bounds, to determine how best to allocate its human resources. McCuen was faced with a disgruntled employee in a position in which she was not satisfied. Under these circumstances, McCuen had two alternatives: either move Andriadis or move Ferguson. Given Andriadis' experience and talents, the second alternative was the only logical choice. A rational solution such as temporarily placing an employee in the secretarial pool while hunting for another suitable position is not pretextual.[68]

■ With regard to Ferguson's second claim of retaliation—involving her termination—the Court holds that plaintiff has established a prima facie case of retaliatory discharge. By the time of the termination, Ferguson had mailed her charge of discrimination. Furthermore, Du Pont received immediate notice of the charge because Ferguson handed a copy to Soule. In early April, Ferguson was offered the position as secretary to Roberts and told that if she did not accept the position, she would no longer have a job with Du Pont. Ferguson, however, was willing to remain in the secretarial pool until a managerial secretary position materialized. At the time, the secretarial pool was understaffed. The required causal link is evident simply by reason of the short passage of time between Ferguson's protected activity and the events leading up to her discharge. *See McCarthy v. Cortland County Community Action Program, Inc.,* 487 F.Supp. 333 (S.D.N.Y.1980); *Hochstadt v. Worcester Foundation for Experimental Biology,* 425 F.Supp. 318, 324 (D.Mass.), aff'd, 545 F.2d 222 (5th Cir.1976).[69] Under

---

**66.** *See infra* note 69.

**67.** Ferguson maintains that her transfer was due to Andriadis' demand that the personal allegations against him be withdrawn. While such a stand is reflected in the record, *see* PX–105, it is also clear that Andriadis offered to apologize if he offended Ferguson in any way. *See* DX–2.

**68.** Du Pont undisputably was engaged in a search for such a position and, in fact, located two possibilities—as a secretary to White or to Roberts. *See supra* at 1183–1184.

**69.** Substantial disagreement exists concerning the proper articulation of the causality requirement. Four standards have been identified which could deem an employer's action retaliatory if the employee's participation in a pro-

these facts, plaintiff has established her prima facie case. It is perfectly reasonable to infer that the choice given to Ferguson—a choice which plaintiff maintains amounted to constructive discharge—had its genesis in Ferguson's protected activity.

 The production burden now shifts to Du Pont to articulate a legitimate nondiscriminatory reason for its actions. Du Pont need not establish by a preponderance or by clear and convincing evidence that such a legitimate reason existed; rather, Du Pont need only articulate such a reason. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. at 252–56; *Kunda v. Muhlenberg College,* 621 F.2d at 543. The Court holds that Du Pont has met its burden in this respect by presenting legitimate reasons for its decision to require plaintiff to accept the reassignment as secretary to Roberts and another person. This was a real opening and was commensurate with plaintiff's pay and skill level. Furthermore, after a diligent search, it was the only available position for the foreseeable future.[70]

Plaintiff contends that these articulated reasons constitute a pretext for intentional gender-based discrimination. Ferguson, however, has articulated no facts which rise to the level of a pretext. Her reliance on Soule's deletion of the term "swing girl" from her performance review as submitted to the EEOC bears no relation to a showing of pretext.[71] Ferguson's only tenable showing of a pretext for intentional discrimination may be found in Du Pont's failure to allow plaintiff to remain in the secretarial pool since there was a temporary need for secretaries in the pool. The Court finds, however, that since defendant made a good faith attempt to locate other positions, it was reasonable to offer plaintiff the choice between accepting the position as secretary to Roberts and another person or leaving. Since plaintiff held the keys to her continued employment in her hands, Du Pont did not retaliate against her for her protected activity. Ferguson chose to leave and has failed to present any evidence of the discriminatory animus required to find Title VII liability after satisfaction of the prima facie case. As such, Ferguson's retaliation claim has no merit.

 Ferguson also alleges that the events which culminated in the "ultimatum" constituted a constructive discharge.[72]

tected activity (1) played any role in the decision, (2) was a substantial factor, (3) was the principal, though not sole reason, or (4) would the action have taken place absent the protected activity. *Sutton v. National Distillers Products,* 445 F.Supp. 1319 (S.D.Ohio 1978), *aff'd* 628 F.2d 936 (6th Cir.1980); *see, e.g., Hochstadt,* 425 F.Supp. at 324 (first standard); *Tidwell v. American Oil Co.,* 332 F.Supp. 424 (D.Utah 1971) (third standard); *Sutton,* 445 F.Supp. at 1328 (fourth standard). While neither the Court of Appeals for the Third Circuit nor the Supreme Court has specifically identified the proper standard, an analogous problem was presented to the Supreme Court in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy* the Court utilized the fourth standard and specifically rejected the other three in the context of a retaliatory firing for engaging in constitutionally protected free speech. *Id.* at 284–86, 97 S.Ct. at 574–75. In any event, the Court need not delve into this controversy because under any of the tests, the causation requirement is satisfied.

**70.** Plaintiff maintains that other managerial, secretarial positions were in fact available and were filled in the relevant time frame. Appar-

ently there were internal department transfers and promotions within other departments which would not have been known to Reilly, the person who conducted the job search, due to Du Pont's policy of first looking within the department to fill a position. As such, Ferguson could not be considered for any of these positions.

**71.** See *supra* note 49.

**72.** Plaintiff also alleged that the hostile environment created by what she characterized as constant sexual comments and innuendos amounted to a constructive discharge because she was forced to leave that position. Such a contention might be true if the management had taken no action to quash the sexual harassment, *see Brown v. City of Guthrie,* 22 Fair Empl.Prac. Cases (BNA) 1127 (W.D.Okla.1980), but this is not the case at bar. Furthermore, plaintiff was removed from the source of her complaints regarding sexual harassment. Plaintiff cannot seriously maintain that she was "forced to resign" (by not accepting an offered position) while she was not subject to any harassment.

The theory of constructive discharge, however, is inapplicable here because plaintiff was not forced to resign due to working conditions made intolerable by discrimination. The applicable test is whether a reasonable person would resign under similar conditions. *See, e.g., Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir. 1982); *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C.Cir.1981); *Wilkins v. University of Houston,* 654 F.2d 388, 390 (5th Cir.1981), cert. denied, —— U.S. ——, 103 U.S. 51, 74 L.Ed.2d 57 (1982); *Heagney v. University of Washington,* 642 F.2d 1157, 1166 (9th Cir.1981). A majority of the courts require a deliberate attempt to create intolerable conditions rather than specific intent to get rid of the plaintiff. *See EEOC v. Hay Associates,* 545 F.Supp. 1064 (E.D.Pa.1982). Plaintiff has made no showing of such a continuous pattern of discriminatory treatment coupled with repeated ineffective attempts to gain relief. *Id.* at 1085–87.

In the final analysis, the employer must have some latitude to manage its affairs. Not every transfer when coupled with a tense situation constitutes retaliation. Corporate management, as distinguished from an individual supervisor, need not succumb to the whims and desires of an employee. Above all else the perspective must be maintained that it was corporate management, and not Ferguson, who was responsible for the operation of Du Pont.

VIII. *Conclusion*

Having found no liability on the part of Du Pont under any of Ferguson's claims, the Court expresses no opinion as to the various types of relief requested by plaintiff. Judgment will be entered for defendant.